## OPINION OF THE JUSTICES TO THE HOUSE OF REPRESENTATIVES.

*Seashore. Beach. Real Property,* Littoral property, Beach. *Constitutional Law,* Due process of law, Police power, Taking of property, Separation of powers. *Eminent Domain,* What constitutes taking.

A "public on-foot free right-of-passage" along the seashore between the mean high water line and the extreme low water line is not a natural derivative of the rights of fishing, fowling and navigation over the tidal lands preserved for the public by the colonial ordinance of 1647 [684-688]; nor have the rights so preserved been expanded by the passage of time to uses for public recreation in tidal lands privately owned [688-689].

Establishment of a "public on-foot free right-of-passage" over tidal lands privately owned, as proposed in a pending legislative bill, thereby denying the owners' right to exclude the public therefrom, would not be an uncompensable exercise of the police power, but would constitute a compensable taking for public use under art. 10 of the Declaration of Rights of the Massachusetts Constitution, and the Fourteenth Amendment to the United States Constitution. [689-690]

In a pending legislative bill proposing a "public on-foot free right-of-passage" over tidal lands privately owned, a provision that "any person having a recorded interest" in such land may petition the Superior Court "to determine whether . . . [the bill] or the activities authorized . . . [thereby] constitute an injury for which the owner is entitled to compensation" under G. L. c. 79, is insufficient to satisfy the constitutional requirement of fair compensation for a taking by eminent domain [690-691]; the provision raises serious constitutional questions with respect to the separation of powers [691-692]; and the procedure proposed in the bill is inadequate both in the scope of its potential compensation and the notice accorded to property owners of their right to recover damages [692-694].

On June 27, 1974, the Justices submitted the following answer to a question propounded to them by the House of Representatives.

To the Honorable the House of Representatives of the Commonwealth of Massachusetts:

The Justices of the Supreme Judicial Court respectfully submit this reply to the question set forth in an order adopted by the House on May 8, 1974, and transmitted to us on May 10, 1974. The order recites the pendency before the General Court of a bill, a copy of which has been transmitted to us with the order. The bill is entitled, "An Act authorizing public right-of-passage along certain coastline of the Commonwealth" (House No. 481).[1]

The bill declares that the reserved interests of the public in the land along the coastline between the mean high water line and the extreme low water line include a "public on-foot free right-of-passage." This "right-of-passage" is only to be exercised after sunrise and before one-half hour after sunset and is not to be exercised in those areas designated by the Commissioner of the Department of Natural Resources as of critical ecological significance and so posted. It is not to be exercised where there exists a structure or enclosure authorized by law, or an agricultural fence enclosing livestock, if such areas are clearly posted. An attempt to prevent the exercise of this right of passage is made punishable by fine, and the burden of proof in any action concerning the exclusion of the exercise of the right is to be on the party seeking to exclude or limit it. Interference with or making unsafe such passage is made unlawful, and a civil remedy is provided to any person affected by such action. Littering while exercising the right of passage is prohibited. The limited tort liability of G. L. c. 21, § 17C, is extended to coastal owners with respect to persons exercising the "right-of-passage" except for injuries caused by a violation of the proposed act.

---

[1] "SECTION 1. Chapter 91 of the General Laws is hereby amended by inserting after section 18A of said chapter 91, the following new section:

"*Section 18B.  Public Right-of-Passage On The Coastline.*

"It is hereby declared and affirmed that the reserved interests of the public in the land along the coastline of the commonwealth include and protect a public on-foot free right-of-passage along the shore of the coastline between the mean high

water line and the extreme low water line subject to the restrictions and limitations as contained in this section.

"Said public on-foot free right-of-passage shall not be exercised (1) later than one-half hour after sunset nor earlier than sunrise (2) where the Commissioner of the Department of Natural Resources for the purpose of protecting marine fisheries and wildlife or for controlling erosion, designates and posts natural areas of critical ecological significance as areas in which, on either a regular or seasonal basis as circumstances in each situation require that the public not exercise the on-foot free right-of-passage (3) where there exists a structure, enclosure or other improvements made or allowed pursuant to any law or any license, permit or other authority issued or granted under the General Laws or where there exist agricultural fences for purposes of enclosing livestock, provided that such area is clearly and conspicuously posted. The exercise of the on-foot right-of-passage in violation of the limitations and restrictions of this paragraph shall be punishable by a fine of not less than twenty nor more than fifty dollars.

"In any action concerning the exclusion of on-foot right-of-passage, the burden of proof shall be upon the person who seeks to exclude or limit the exercise of said public rights. Whenever it is found that a person seeks to exclude the on-foot right-of-passage by unlawfully posting said area, then such person shall be punishable by a fine of not less than twenty nor more than fifty dollars.

"Any interference with, or any acts making unsafe, the on-foot free right-of-passage including, but not limited to, (1) the use of force or (2) maintenance of any fence or other obstruction not specifically authorized under the General Laws or a license, permit or other authority issued or granted under the General Laws, is hereby declared to be unlawful. This section may be enforced under chapter 12, section 11D of the General Laws or, in an action brought in district court by a person directly affected by a violation of this section, for such monetary and equitable relief as the court deems to be necessary and proper.

"Any person who in exercising the public on-foot free right-of-passage deposits or causes to be deposited in the water or on the shore garbage, paper, refuse, bottles, cans, rubbish or trash of any kind or nature shall be punished by a fine of not less than twenty nor more than fifty dollars.

"Except as to injuries proximately caused by a violation of this section, the exercise by the public of the on-foot free right-of-passage shall be considered a permitted use to which the limited liability provisions of chapter 21, section 17C of the General Laws shall apply.

"Except as otherwise provided in this section, the on-foot free right-of-passage shall not be construed in any way to affect existing statutory or common law property or personal rights or remedies of any persons or the commonwealth. Provided: any person having a recorded interest in any land affected by this section may petition the superior court under the provisions of Chapter 79 of the General Laws to determine whether this section or the activities authorized herein constitute an injury for which the owner is entitled to compensation under said chapter 79. Any such petition shall be filed within two years from the effective date of this act. In any such action, the court shall consider in determining the issues presented by any such petition, the nature and effect of the reserved interests of the public in coastal lands and waters of the commonwealth on the recorded interest upon which the petition is based. Any order issued in such an action shall apply only with respect to the recorded interest upon which the petition is based and the method provided in this paragraph for the determination of the issue of whether this section or the activities authorized herein constitute an injury for which the owner is entitled to compensation shall be exclusive.

"SECTION 2. The Commissioner of Public Works shall under the authority of this act record a notice prior to the effective date thereof that Section 18B has been adopted into law, free of charge, in every county of the commonwealth where coastline land is required to be recorded. Said notice shall have section one of this act appended thereto.

"Within 60 days of the effective date of this act, the Commissioner of Public Works shall, under the authority of this act, cause a notice of this act and the

The bill further provides that it is not to be construed as altering existing statutory or common law property or personal rights or remedies. It then states that any person having a recorded interest in any land affected may "within two years from the effective date of this act" petition the Superior Court under G. L. c. 79 "to determine whether . . . the activities authorized herein constitute an injury for which the owner is entitled to compensation under said chapter 79." Finally, the bill requires the Commissioner of Public Works to record a notice of its adoption, prior to its effective date, in every county where coastline land is required to be recorded. He is also required to give such notice by publication within sixty days after its effective date for three consecutive weeks in newspapers in cities and towns containing affected coastal land.

The order asserts that grave doubt exists as to the constitutionality of the bill if enacted into law and propounds the following question:

"Would the pending Bill if enacted into law violate Article X of the Bill of Rights of the Constitution of the Commonwealth or the Fourteenth Amendment to the Constitution of the United States?"[2]

At common law, private ownership in coastal land extended only as far as mean high water line. Beyond that, ownership was in the Crown but subject to the rights of the public to use the coastal waters for fishing and navigation. Whittlesey, Law of the Seashore, Tidewaters and Great Ponds (1932) xxviii-xxix. *Commonwealth* v. *Roxbury*, 9 Gray 451, 482-483 (1857). When title was transferred to private persons it remained impressed with these public rights. *Shively* v. *Bowlby*, 152 U. S. 1, 13 (1893). The property inherent in the Crown in England was passed by charter to the Massachusetts Bay Colony and ultimately to

substance of the provisions of section one of this act to be published for three consecutive weeks in newspapers of general circulation in cities and towns of the commonwealth wherein land affected by this act lies."

[2] The court acknowledges with appreciation the receipt of helpful briefs that were submitted on its invitation by the Massachusetts Conveyancers' Association and the Conservation Law Foundation of New England, as well as a brief submitted by Robert G. Millar, Esquire.

the Commonwealth. Massachusetts Constitution, Part II, c. 6, art. 6. See *Commonwealth* v. *Roxbury, supra,* at 483-484. In the 1640's, in order to encourage littoral owners to build wharves, the colonial authorities took the extraordinary step of extending private titles to encompass land as far as mean low water line or 100 rods from the mean high water line, whichever was the lesser measure. *Storer* v. *Freeman,* 6 Mass. 435 (1810). This was accomplished by what has become known as the colonial ordinance of 1641-47, which is found in the 1649 codification, The Book of the General Lawes and Libertyes, at p. 50. "Every Inhabitant who is an housholder shall have free fishing and fowling in any great ponds, bayes, Coves and Rivers, so farr as the Sea ebbs and flowes, within the precincts of the towne where they dwell, unles the freemen of the same Town or the General Court have otherwise appropriated them. . . . The which clearly to determine, It is Declared, That in all *Creeks, Coves* and other places, about and upon *Salt-water,* where the Sea ebbs and flowes, the proprietor of the land adjoyning, shall have propriety to the low-water mark, where the Sea doth not ebb above a hundred Rods, and not more wheresoever it ebbs further. Provided that such proprietor shall not by this liberty, have power to stop or hinder the passage of boates or other vessels, in or through any Sea, Creeks, or Coves, to other mens houses or lands."

Although strictly the ordinance was limited to the area of the Massachusetts Bay Colony, it has long been interpreted as effecting a grant of the tidal land to all coastal owners in the Commonwealth. *Weston* v. *Sampson,* 8 Cush. 347, 353-354 (1851), and cases cited. The language of the ordinance well illustrates the notion, previously alluded to, of reserved public right. It expressly specifies that the public is to retain the rights of fishing, fowling and navigation. Notwithstanding these limitations and the use of such ambiguous terms as "propriety" and "liberty," there is ample judicial authority to the effect that the ordinance is properly construed as granting the benefitted owners a fee in the seashore to the extent described and subject to the public rights reserved. It is unnecessary to cite more than a

few of the many cases to that effect. In *Commonwealth* v. *Alger*, 7 Cush. 53 (1851), probably the leading case on the subject, Chief Justice Shaw wrote, "[The ordinance] imports not an easement, an incorporeal right, license, or privilege, but a *jus in re*, a real or proprietary title to, and interest in, the soil itself, in contradistinction to a usufruct, or an uncertain and precarious interest." *Id.* at 70. "[It created] a legal right and vested interest in the soil, and not a mere permissive indulgence, or gratuitous license, given without consideration, and to be revoked and annulled at the pleasure of those who gave it." *Id.* at 71. In *Butler* v. *Attorney Gen.* 195 Mass. 79, 83 (1907), it was said, "Except as against public rights, which are protected for the benefit of the people, the private ownership is made perfect," and in *Boston* v. *Boston Port Dev. Co.* 308 Mass. 72, 78-79 (1941), this ownership in tidal land was deemed property of a "substantial nature." See, e.g., *Walker* v. *Boston & Maine R.R.* 3 Cush. 1, 21 (1849); *Henry* v. *Newburyport*, 149 Mass. 582, 584-585 (1889); *Jubilee Yacht Club* v. *Gulf Ref. Co.* 245 Mass. 60 (1923); *Michaelson* v. *Silver Beach Improvement Assn. Inc.* 342 Mass. 251, 257 (1961).

If, therefore, the right of passage authorized by the bill is, as it declares, merely an exercise of existing public rights, and not a taking of private property, it must be a natural derivative of the rights preserved by the colonial ordinance. It has been held proper to interfere with the private property rights of coastal owners in the tidal area for purposes reasonably related to the protection or promotion of fishing or navigation without paying compensation. *Home for Aged Women* v. *Commonwealth*, 202 Mass. 422 (1909). *Crocker* v. *Champlin*, 202 Mass. 437 (1909). An "on-foot right-of-passage" is not so related to these public rights. The cases interpreting the right of the public in navigation all deal with the use in boats or other vessels of the area below mean high water mark "when covered with tide water." *Commonwealth* v. *Charlestown*, 1 Pick. 180, 183-184 (1822). *Commonwealth* v. *Alger*, 7 Cush. 53, 97 (1851). *Old Colony St. Ry.* v. *Phillips*, 207 Mass. 174, 180-181 (1911). Thus the right of passage over dry land at

periods of low tide cannot be reasonably included as one of the traditional rights of navigation.

We have frequently had occasion to declare the limited nature of public rights in the seashore. For example, a littoral owner may build on his tidal land so as to exclude the public completely as long as he does not unreasonably interfere with navigation. Compare *Austin* v. *Carter*, 1 Mass. 231 (1804), and *Locke* v. *Motley*, 2 Gray 265 (1854), with *Kean* v. *Stetson*, 5 Pick. 492 (1827). Nor do public rights extend so far as to give an adjoining owner the right to require a littoral owner to allow the tidewater to flow across the shore to the former's land for drainage. *Henry* v. *Newburyport*, 149 Mass. 582, 584-585 (1889). These limitations are also evident in comparing *Weston* v. *Sampson*, 8 Cush. 347 (1851), with *Porter* v. *Shehan*, 7 Gray 435 (1856), both written by Chief Justice Shaw. In the *Weston* case, the defendants entered upon the plaintiffs' tidal land by boat, and their digging for clams was held to be an exercise of the reserved public right of fishing. In the *Porter* case, however, it was deemed a trespass for the defendant to enter and take five cords of muscle mud "consisting of living and dead shell fish . . . and the soil or clay in which they were found," and used principally as a fertilizer. 7 Gray at 435-436. The Chief Justice wrote that this exceeded the public rights in fishing, and that there was "no right to take the soil, or fish shells, part of the soil, except as slight portions of the soil would necessarily and ordinarily be attached to shell fish, when taken." *Id.* at 437. A similar contrast may be discerned in *Anthony* v. *Gifford*, 2 Allen 549 (1861), in which it was held that the reserved public rights could be exercised under a statute allowing any person to collect seaweed, kelp and other marine plants "[s]o long as they are afloat and driven or moved from place to place by the rising tide," *id.* at 550, but not once they had come to rest on the beach land owned privately by virtue of the colonial ordinance.

We are unable to find any authority that the rights of the public include a right to walk on the beach. In a case presenting a very similar question to that raised by the bill,

it was held that the public rights in the seashore do not include a right to use otherwise private beaches for public bathing. *Butler* v. *Attorney Gen.* 195 Mass. 79 (1907). "We think that there is a right to swim or float in or upon public waters as well as to sail upon them. But we do not think that this includes a right to use for bathing purposes, as these words are commonly understood, that part of the beach or shore above low water mark, where the distance to high water mark does not exceed one hundred rods, whether covered with water or not. It is plain, we think, that under the law of Massachusetts there is no reservation or recognition of bathing on the beach as a separate right of property in individuals or the public under the colonial ordinance." *Id.* at 83-84. See *Michaelson* v. *Silver Beach Improvement Assn. Inc.* 342 Mass. 251 (1961).

We have considered an able argument made in the brief of one of the amici curiae that we should interpret the colonial ordinance as vesting in the Commonwealth the right to allow all significant public uses in the seashore. It is contended that while fishing, fowling and navigation may have exhausted these uses in 1647, these public uses change with time and now must be deemed to include the important public interest in recreation. Whatever may be the propriety of such an interpretation with respect to public rights in littoral land held by the State, compare *Borough of Neptune City* v. *Borough of Avon-by-the Sea*, 61 N. J. 296, 308-309 (1972), we think the cases we have cited make clear that the grant to private parties effected by the colonial ordinance has never been interpreted to provide the littoral owners only such uncertain and ephemeral rights as would result from such an interpretation. The rights of the public though strictly protected have also been strictly confined to these well defined areas. "[T]he only specific powers which have been expressly recognized as exercisable without compensation to private parties are those to regulate and improve navigation and the fisheries." *Michaelson* v. *Silver Beach Improvement Assn. Inc.* 342 Mass. 251, 256 (1961). Since this is not such a project or

regulation it cannot be considered merely a manifestation of the reserved rights of the public.

It is next necessary to inquire whether the authorization of the right of passage provided by the bill, while not within the public rights reserved by the colonial ordinance, is nonetheless a proper exercise of the Commonwealth's police power and, as such, does not require that compensation be paid to the private owners. See, e.g., *Massachusetts Commn. Against Discrimination* v. *Colangelo*, 344 Mass. 387, 394-397 (1962). The elusive border between the police power of the State and the prohibition against taking of property without compensation has been the subject of extensive litigation and commentary. See Bosselman, Callies & Banta, The Taking Issue (1973). But these difficulties need not concern us here. The permanent physical intrusion into the property of private persons, which the bill would establish, is a taking of property within even the most narrow construction of that phrase possible under the Constitutions of the Commonwealth and of the United States.

It is true that the bill does not completely deprive private owners of all use of their seashore property in the sense that a formal taking does. But the case is readily distinguishable from such regulation as merely prohibits some particular use or uses which are harmful to the public. See *Commonwealth* v. *Alger*, 7 Cush. 53, 86 (1851). The interference with private property here involves a wholesale denial of an owner's right to exclude the public. If a possessory interest in real property has any meaning at all it must include the general right to exclude others. Nichols, Eminent Domain (Rev. 3d ed.) § 5.1 [1] (1970).

Here the Commonwealth proposes to take easements for the benefit of the public, *Grove Hall Sav. Bank* v. *Dedham*, 284 Mass. 92 (1933); *Cayon* v. *Chicopee*, 360 Mass. 606, 609-610 (1971), and compensation is required. The bill seeks to require private owners to permit affirmative physical use of their property by the public. "[W]e know no right which the legislature have to require a citizen to make his property

convenient for his neighbor's use without compensation." *Morse* v. *Stocker*, 1 Allen 150, 158 (1861). See *Delaware, Lackawanna & Western R.R.* v. *Morristown*, 276 U. S. 182, 194-195 (1928). Even commentators who, as a matter of constitutional law, favor the narrowest interpretation of "takings" agree that a "physical invasion" must be so considered. Bosselman, Callies & Banta, *supra*, at 254-255.

The bill, therefore, would effectively appropriate property of individuals to a public use and thus is controlled by the constitutional restriction of art. 10 of the Declaration of Rights of the Massachusetts Constitution, and the Fourteenth Amendment to the United States Constitution. These provisions require that such takings be for a public purpose and that reasonable compensation be paid. See *Caleb Pierce, Inc.* v. *Commonwealth*, 354 Mass. 306, 308-309 (1968). We think it is evident that the creation of the proposed right of passage would serve the recognized public interest in the providing of recreational facilities. *Salisbury Land & Improvement Co.* v. *Commonwealth*, 215 Mass. 371, 374 (1913). *Rindge Co.* v. *County of Los Angeles,* 262 U. S. 700, 708 (1923). There is considerable question, however, whether the bill as written makes adequate provision for the constitutional requirement of fair compensation.

The bill permits "any person having a recorded interest in any land affected" by the bill within two years to "petition the superior court under the provisions of chapter 79 of the General Laws to determine whether this section or the activities authorized . . . [by the bill] constitute an injury for which the owner is entitled to compensation under said chapter 79." The exact intended meaning of this provision is somewhat unclear but we think that even under the most generous interpretation it is insufficient to satisfy the constitutional requirement of compensation.

By its choice of the word "injury" rather than "taking" or "appropriation," the bill may be making special reference to G. L. c. 79, § 9, which permits compensation to be awarded under G. L. c. 79 for "injury" to real estate caused "by the establishment, construction, maintenance, operation, alteration, repair or discontinuance of a public

improvement which does not involve the taking of private property." "The language of . . . [this statute] reflects the distinction between takings, for which compensation is compelled, and other injuries which are compensated only as a matter of legislative grace." *Cann* v. *Commonwealth*, 353 Mass. 71, 74 (1967). Such an interpretation of the bill, applying the compensation provisions only to indirect injury to the upland property of littoral owners, is plausible given the bill's initial statement that the proposed right of passage represents merely an exercise of reserved public rights. If this interpretation is correct the bill is plainly deficient for failing to provide compensation for the taking of tidal land which we have found implicit in its terms.

Even if we were to construe the "injury" alluded to in the bill to be the taking of the right of passage itself, the method of compensation provided is inadequate. Such a taking with compensation "should not be accomplished by the use of ambiguous or uncertain language." *Glover* v. *Boston*, 14 Gray 282, 288 (1859). *Turner* v. *Gardner*, 216 Mass. 65, 70 (1913). It is not sufficient for a statute to authorize a taking and then provide a possibility of compensation in a later proceeding as this bill would do. "The power to take and the obligation to indemnify for the taking are inseparable." *Attorney Gen.* v. *Old Colony R.R.* 160 Mass. 62, 90 (1893), quoting from *Drury* v. *Midland R.R.* 127 Mass. 571, 576 (1879).

What the bill in effect attempts is to transfer from the Legislature to the courts not merely the decision on the amount of compensation but also the decision whether or not to compensate, that is, whether or not to exercise the power of eminent domain. This would raise serious constitutional questions with respect to the separation of powers. See art. 30 of the Declaration of Rights of the Massachusetts Constitution. Article 10 of the Declaration of Rights provides that private property may not be appropriated to public uses without the consent of the owner or "of the representative body of the people." The power of eminent domain is a legislative power. *Talbot* v. *Hudson*, 16 Gray 417, 420-422 (1860). Nichols, Eminent

Domain (Rev.3d ed.) § 3.2 (1973). While that power may be delegated to various public and private agencies, *Opinion of the Justices*, 330 Mass. 713, 718-719 (1953), particular care must be taken when the delegation crosses the boundaries of the three departments of government. "In *Varick* v. *Smith*, 5 Paige, 137, it is said that the legislature is the sole judge as to the expediency of . . . exercising the right of eminent domain . . . either for the benefit of the inhabitants of the state or of any particular portion thereof." *Dingley* v. *Boston*, 100 Mass. 544, 558 (1868).[3]

Even if we were to hold that compensation to private owners for the taking of this public easement were provided in the bill it would still be constitutionally defective, for the procedure proposed is inadequate both in the scope of its potential compensation and the notice accorded to property owners of their right to recover damages.

The only property owners given an opportunity to seek damages are those having a recorded interest in affected property. It is obvious that this omits all property owners who hold their title by unrecorded deed or adverse possession. Either manner of acquiring property gives good title. While the grantee under an unrecorded deed may not prevail against those protected by the recording statute, he still possesses a valuable property interest, see *Jacobs* v. *Jacobs*, 321 Mass. 350, 351 (1947), and is thus entitled to compensation. See *Old Colony & Fall River R.R.* v. *County of Plymouth*, 14 Gray 155, 161 (1859). Similarly, we have held that one holding title by adverse possession, as well as

---

[3] The procedure here is to be distinguished from that provided in G. L. c. 131, § 40A, inserted by St. 1968, c. 444, § 1, and as amended by St. 1972, c. 782, and G. L. c. 21, § 17B, inserted by St. 1971, c. 840. In those statutes the Commissioner of Natural Resources is empowered to issue individual orders prohibiting private owners from certain activities on scenic waterways or inland wetlands. An owner is given recourse to the Superior Court "to determine whether such order so restricts the use of his property as to deprive him of the practical uses thereof and is therefore an unreasonable exercise of the police power because the order constitutes the equivalent of a taking without compensation." If the court so finds, the order is not to be effective. In those cases, of course, the circumstances will vary with each case. More significantly, those laws clearly preclude an exercise of the power of eminent domain by the Legislature or the court. The remedy if a taking is apparent is not an award of damages by the court but a negation of the order. Therefore there is no possible exercise of the taking power by the judiciary.

a holder by adverse possession which has not yet ripened into title, may maintain an action for compensation for a taking by the Commonwealth. *Andrew* v. *Nantasket Beach R.R.* 152 Mass. 506 (1890). Since the proposed bill does not provide compensation for either of these classes of owners it is constitutionally inadequate.

Furthermore, with respect to those owners as well as to those of recorded interests, it is a matter of serious question whether the method of notice to affected property owners is sufficient. Notice prior to the exercise of the power of eminent domain is constitutionally required. *Appleton* v. *Newton*, 178 Mass. 276, 281 (1901). The bill provides only constructive notice by recording and publication. A number of our older cases may be read to hold that such constructive notice is adequate. *Taylor* v. *County Commrs. of Hampden*, 18 Pick. 309, 311-312 (1836). *Brock* v. *Old Colony R.R.* 146 Mass. 194 (1888). *Appleton* v. *Newton*, *supra*, at 281-283. More recent cases of the United States Supreme Court, however, suggest that a more stringent standard is necessary to satisfy the notice requirements of the Fourteenth Amendment. In *Walker* v. *Hutchinson*, 352 U. S. 112 (1956), the court found that notice by publication was insufficient to meet the proper due process standard in a condemnation proceeding. The same was found true of more extensive publication, together with posting in the vicinity of the condemned property, in *Schroeder* v. *City of New York*, 371 U. S. 208 (1962). In both of these cases the court applied the notice standard articulated in *Mullane* v. *Central Hanover Bank & Trust Co.* 339 U. S. 306 (1950), in which it was said that what was required was "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314.

The notice provisions of the bill fall short of this standard. As was noted in the above cited cases, publication is inadequate when the names and addresses of the affected persons are available. *Walker* v. *Hutchinson, supra*, at 116. *Schroeder* v. *City of New York, supra*, at 212-213. "It is

common knowledge that mere newspaper publication rarely informs a landowner of proceedings against his property." *Walker* v. *Hutchinson*, *supra*, at 116. The recording of notice, which the bill would require, does not significantly increase the likelihood that the taking will come to the attention of affected owners before the two-year period expires. First, since there is no requirement that the notice be indexed or recorded on the certificate of registration of registered land, such notice will not be specifically directed to the affected land. Second, even if this were not the case, owners rarely have recourse to the registries of deeds other than on the sale or purchase of real estate. It is unlikely that any but a very few of the affected littoral owners would have occasion to come into contact with the recorded notices. Since individual personal notice is possible in most cases merely by obtaining the necessary names and addresses of the appropriate parties from the local assessors of the cities and towns where the land is located, the procedure prescribed in the bill would not comport with due process.

For all of the above reasons we believe the bill if enacted into law would violate art. 10 of the Declaration of Rights of the Massachusetts Constitution, and the Fourteenth Amendment to the Constitution of the United States. The foregoing discussion, however, is intended to give indication of the alterations necessary to render the bill constitutionally adequate.

We answer the question "Yes."

Mr. Justice Kaplan did not participate in this opinion.

> G. JOSEPH TAURO
> PAUL C. REARDON
> FRANCIS J. QUIRICO
> ROBERT BRAUCHER
> EDWARD F. HENNESSEY
> HERBERT P. WILKINS