## Richmond

ARCHIE L. BRADFORD, ET AL.

V.

THE NATURE CONSERVANCY, ET AL.

Record No. 791288.

THE NATURE CONSERVANCY, ET AL.

V.

ARCHIE L. BRADFORD, ET AL.

Record No. 791297.

COMMONWEALTH OF VIRGINIA

V.

ARCHIE L. BRADFORD, ET AL.

Record No. 791320.

September 9, 1982.

Present: Cochran, Poff, Compton, Thompson, Stephenson, and Russell, JJ., and Harrison, Retired Justice.

186

188

*Herbert H. Bateman (Jones, Blechman, Woltz & Kelly, P.C.,* on briefs), for appellants. (Record No. 791288)

*Daniel Hartnett; Stewart A. Baker (Henry B. Weaver [D.C.]; Alice L. Mattice [D.C.]; Ayres, Hartnett & Custis; Steptoe & Johnson [D.C.],* on brief), for appellees. (Record No. 791288)

*Daniel Hartnett; Stewart A. Baker (Henry B. Weaver [D.C.]; Alice L. Mattice [D.C.]; Ayres, Hartnett & Custis; Steptoe & Johnson [D.C.],* on briefs), for appellants. (Record No. 791297)

*Herbert H. Bateman; James E. Moore, Assistant Attorney General (Marshall Coleman, Attorney General; Jones, Blechman, Woltz & Kelly, P.C.,* on briefs), for appellees. (Record No. 791297)

*Amicus Curiae: Virginia Land Title Association, Inc. et al. (R. Gordon Smith; Joseph L. S. St. Amant; E. Duncal Getchell, Jr.,* on brief), for the Nature Conservancy, appellant. (Record No. 791297)

*James E. Moore, Assistant Attorney General (Marshall Coleman, Attorney General,* on briefs), for appellant. (Record No. 791320)

*Daniel Hartnett; Stewart A. Baker; Herbert H. Bateman (Henry B. Weaver [D.C.]; Alice L. Mattice [D.C.]; Ayres, Hartnett & Custis; Steptoe & Johnson [D.C.]; Jones, Blechman,*

*Woltz & Kelly, P.C.*, on briefs), for appellees. (Record No. 791329)

STEPHENSON, J., delivered the opinion of the Court.

In this appeal, we determine the various rights and privileges of owners and other users of Hog Island. This task requires us to trace the history of Virginia's land-grant statutes back to the 1700's.

Hog Island is one of a number of barrier islands located off the eastern coast of Virginia. It is approximately six miles long and ranges in width from one mile near the northern end to an estimated 300 yards at the southern end. The island has been greatly affected over the years by the forces of nature. Since 1930, the dimensions of the two ends of the island have virtually reversed themselves.

The island is characterized by three distinct ecological features. The eastern portion consists of sandy beaches. These beaches lead to a series of sand dunes and grassy areas, commonly known as the uplands. Adjacent to the uplands on the west side of the island, extending towards the mainland, are marshes.

Hog Island was well settled by the early 1800's. The majority of residents was located in the village of Broadwater, near the southern end of the island. By 1900, this village had a population of 250. Most islanders made their living from the wildlife found in the area. In the 1930's a series of storms swept Broadwater into the Atlantic Ocean, and by 1942 all the inhabitants had left the island.

The federal government built a lighthouse on the southern end of Hog Island in 1851 and added a Coast Guard Station in the 1920's. A road led from a landing at Swan Gut past the station to Broadwater and the beach. In 1936, the government built a second station at the northern end of the island. A road was built leading from this station in an easterly direction towards the beach. A north-south road ran the length of the island, through the upland, connecting the other two roads. (These roads shall be referred to respectively as the cross-island, beach-access and north-south roads.) Despite the presence of the north-south road, the preferred route of travel between the ends of the island was along the beach, which is suitable for use by vehicles during low tide.

Some time after World War II, the Coast Guard abandoned both stations. In 1966, the northern station was conveyed to the Machipongo Club, a group of sportsmen.

In 1970, the Nature Conservancy, a nonprofit organization chartered in Washington, D.C., began to acquire property on Hog Island and other barrier islands. The Conservancy purchased large tracts on the northern and southern ends of the island and two smaller tracts in the middle. Title to one parcel in the northern tract can be traced to a land grant from the Commonwealth in 1901, and one of the small tracts in the middle of the island can be traced to a land grant in 1915. The Conservancy is unable to trace the title of its other properties to original grants.

The avowed purpose of the Conservancy is to preserve the barrier islands in their natural state by limiting intrusions by man. The restrictions placed on Hog Island by the Conservancy led to a dispute with the Machipongo Club. The Conservancy claimed the Club had no right to use the roads on the island or to hunt or fish on any of the Conservancy's properties, including the beach and marshes. The Conservancy brought suit in federal court. *Nature Conservancy* v. *Machipongo Club, Inc.*, 419 F. Supp. 390 (E.D. Va. 1976), *rev'd in part*, 571 F.2d 1294, *modified on rehearing*, 579 F.2d 873 (4th Cir.), *cert. denied*, 439 U.S. 1047 (1978). The Fourth Circuit held the Club had no right to use the roads on the island, but stayed a determination regarding the beaches and the marshes because of the pendency of the instant suit. 579 F.2d at 876.

The present suit is a declaratory judgment action brought by Archie Bradford and 17 other complainants (collectively, Bradford) who either own land on the island or have hunted, fished and fowled there. (The Commonwealth later intervened as a plaintiff.) They asked the trial court to declare their right to carry out these activities and to use the disputed roads. The court held the Conservancy had no title to the marshes on the island. Further, it ruled that while the Conservancy had title to some portions of the beach, these areas could be used by citizens of the Commonwealth for hunting, fishing and fowling. Finally, the court held the beach-access road and the beach, but not the north-south road, had been dedicated by the landowners as public ways.[1] The court issued an

---

[1] The court also held the public had a right to use the cross-island road. This ruling has not been appealed.

injunction consistent with these rulings and all parties have appealed.

### I.

In 1888, the General Assembly passed an act, now codified as Code § 41.1-4, providing that:

> All unappropriated marsh or meadowlands lying on the Eastern Shore of Virginia, which have remained ungranted, and which have been used as a common by the people of this State, shall continue as such common, and remain ungranted. Any of the people of this State may fish, fowl, or hunt on any such marsh or meadowlands.

Relying on this section, the trial court ruled that any grants of marshes on the island made by the Commonwealth after 1888 were void, and title to the land remained in the Commonwealth, for use by the people as a common. The court construed "meadowlands" to mean the same as "marsh," and therefore did not extend its ruling to include any of the uplands on the island.

The Conservancy makes a three-pronged attack on this holding. It first argues the plaintiffs are barred from challenging the validity of the land grants. Secondly, it argues the statute is inapplicable, since the marshes were not used as a common in 1888. If applicable, the Conservancy contends the statute is unconstitutional. In turn, Bradford and the Commonwealth argue the court erred in not extending the application of the statute to the uplands. We reject all these arguments and affirm the ruling of the trial court respecting the marshes.

The Conservancy relies on Code §§ 8.01-238[2] and 41.1-6[3] to buttress its argument that the plaintiffs cannot now challenge the land grants in its chain of title. It argues that under § 8.01-238 any such challenge must be brought within ten years of the date of such grant. It further contends that Code § 41.1-6 ratifies all

---

[2] Code § 8.01-238 reads as follows:
A bill in equity to repeal, in whole or in part, any grant of land by the Commonwealth, shall be brought within ten years next after the date of such grant.

[3] Code § 41.1-6 reads as follows:
Any grants for land heretofore issued by the State Librarian pursuant to § 41.1-3 [§ 41-8 of the Code of 1950] are hereby ratified and confirmed and title is confirmed in the grantees thereof.

grants previously made, even if unlawful at the time they were issued. Both arguments are without merit.

■ Code § 8.01-238 only applies to bills in equity to repeal grants. It is therefore inapplicable to the present suit, a declaratory judgment action to determine the rights of the parties. Moreover, because the statute does not, by its express terms, apply to the Commonwealth, it cannot bar an action by it. Code § 8.01-231. For these reasons, the suit is not barred by the statute of limitations.

■ The Conservancy argues Code § 41.1-6 ratifies all land grants made by the Commonwealth. By its terms, however, the section only applies to grants issued by the State Librarian, who only held the power to issue grants between 1948 and 1954. This section, enacted in 1966, applies only to grants made during that time.

■ The Conservancy correctly argues the 1888 statute only applies to land used as a common. *Powell* v. *Field*, 155 Va. 612, 155 S.E. 819 (1930). It argues "common" has a narrow legal definition and the evidence fails to support a finding that the marshes on Hog Island were used as a common within the meaning of the statute.

■ We discussed the meaning of the word "common" in *Miller* v. *Commonwealth*, 159 Va. 924, 166 S.E. 557 (1932). There, we said land can become a common in one of two ways. The first, inapplicable here, is for a government to specifically designate land for that purpose. *Id.* at 948, 166 S.E. at 565. The second is when land has been "used by the people as a common and come[s] to be recognized as such." *Id. See also French* v. *Bankhead*, 52 Va. (11 Gratt.) 136, 166 (1854).

■ The trial court heard testimony from a number of elderly people knowledgeable about the history and traditions of Hog Island. Based on their associations with others much older than they, these witnesses related that for many years prior to 1888 the marshes had been used by the public at will for fishing, fowling and hunting. Indeed, this had been the primary source of livelihood for the island's inhabitants for generations. Moreover, the island was used not only by its inhabitants, but by people from other parts of the Commonwealth and nation. As a result of this testimony, the trial court found the evidence to be "overwhelming" that the marshes were used by the people as a common. *See Garrison* v. *Hall*, 75 Va. 150, 156-57 (1881).

No evidence was introduced to dispute the trial court's finding. However, the Conservancy argues the sworn affidavits of the county surveyor that the lands in question were "liable to entry" proves conclusively the marshes were not used as a common, since the surveyor would not make an affidavit if the land was prohibited from grant by statute. (These affidavits were a requirement of the land-grant procedure.) We reject this argument.

While public officers are presumed to act lawfully, this presumption is rebuttable. Were it not, no grant from the Commonwealth could be voided once it was made, since the fact of issuance would be proof of validity. This, however, is not the case, as a statutory procedure exists for challenging the validity of grants. Code § 41.1-13.

We thus hold the trial court was correct in finding the marshes of Hog Island were used as a common. The 1888 act therefore prohibited the granting of this land. Furthermore, the court correctly held the terms "marsh" and "meadowland" were synonymous and ruled the statute did not apply to portions of the uplands on the island. This holding is supported by evidence in the case as to the meaning of the terms on the Eastern Shore in the 1800's and by case law from other jurisdictions. *See, e.g., Lawrence* v. *Town of Hempstead*, 155 N.Y. 297, 303, 49 N.E. 868, 869 (1898).

Nevertheless, the Conservancy argues the trial court's holding respecting the marshes must fail because the 1888 statute is unconstitutional. It argues the statute violates the equal protection and privileges and immunities clause of the Fourteenth Amendment of the Federal Constitution because it only applies to the Eastern Shore and because it restricts use of the marshes to citizens of Virginia. Assuming the Conservancy has standing to raise these issues, we reject its arguments.

The equal protection clause does not bar statutory classifications; it only requires them to have a rational basis. *McGowan* v. *Maryland*, 366 U.S. 420 (1961). The General Assembly in 1888 decided certain lands on the Eastern Shore were entitled to special protection. This was a rational decision and one that continues to the present day. *See* Virginia Wetlands Act, Code § 62.1-13.1, *et seq.*; Coastal Primary Sand Dune Protection Act, Code § 62.1-13.21, *et seq.* Indeed, the Conservancy evidently shares the view that certain areas are either more entitled to protection or more in need of it.

■ With regard to the second argument, we find no evidence the act has ever been applied to limit the use of the Eastern Shore marshes to Virginia residents. We, therefore, hold the 1888 act and its successor, Code § 41.1-4 are constitutional.

## II.

■ At common law, the shores of the sea[4] were vested in the Crown as part of its *jus privatum. Shively* v. *Bowlby*, 152 U.S. 1, 11-13 (1894); *Miller* v. *Commonwealth*, 159 Va. 924, 929, 166 S.E. 557, 558 (1932). However, this land was available to the public for purposes of navigation, fishing and fowling. *Miller*, 159 Va. at 929, 166 S.E. at 558. While the shores could be granted by the sovereign to a private individual, it was presumed a grant of highlands did not convey the adjoining shore, unless a specific contrary intention was shown. *Id.*

■ The common law of England, of course, became the common law of Virginia, and the lands previously vested in the Crown passed to the Commonwealth. *Avery* v. *Beale*, 195 Va. 690, 697, 80 S.E.2d 584, 588 (1954); *Commonwealth* v. *Newport News*, 158 Va. 521, 541, 164 S.E. 689, 694-95 (1932). Until 1779, no statute existed for disposing of this land, and grants could only be made by special act of the General Assembly. *Miller*, 159 Va. at 945, 166 S.E. at 564. This situation was altered in May, 1779, when the General Assembly passed an act establishing a land office and providing conditions for the granting of waste and unappropriated land. 10 Hening, Statutes at Large, 50. The primary features of this system remained in effect until 1952, when the power to dispose of waste land was transferred to the circuit courts. Acts 1952, ch. 185.

■ In 1780, the General Assembly rectified an area left in question by the 1779 act. As discussed in *Miller*, certain areas of the Commonwealth, either by designation or usage, came to be reserved as commons for use by all citizens. 159 Va. at 941-48, 166 S.E. at 563-65. Under the 1779 act, it appeared such areas could be granted. This question was answered by an act which provided that:

---

[4] For the purpose of this opinion, the terms shore and beach are defined as the area between ordinary high and low water marks. *Thurston v. Portsmouth, 205 Va. 909, 911, 140 S.E.2d 678, 680 (1965); French v. Bankhead*, 52 Va. (11 Gratt.) 136, 160 (1854).

[A]ll unappropriated lands on the bay of Chesapeake, on the sea shore, or on the shores of any river or creek in the eastern parts of this commonwealth, which have remained ungranted by the former government, and which have been used as common to all the good people thereof, shall be, and the same are hereby excepted out of the said recited act, and no grant issued by the register of the land office for the same, either in consequence of any survey already made, or which may hereafter be made, shall be valid or effectual in law, to pass any estate or interest therein.

10 Hening, Statutes at Large, 226-27.

The 1780 act has been reenacted throughout the years, its current form being found in Code § 62.1-1.[5] In 1792, the 1779 and 1780 acts were combined. Acts 1792, CLXXXVI, 149. In 1802, an act was passed to protect lands bordering on waters in the western part of the Commonwealth, Acts 1801-02, ch. 8, and the policy of this statute was incorporated into the overall act in 1819. Code 1819, ch. 86. In 1873, the General Assembly made a significant amendment to the act. The reservation from grant was extended to preserve all the Atlantic shore still titled in the Commonwealth, whether previously used as a common or not. Acts, 1872-73, ch. 333.

In 1849, the statute in question was separated into two parts. Chapter 62 of the 1849 Code, entitled "Water Courses," delineated the areas to be held as a common. However, the prohibition on granting these areas was moved to Chapter 112, and placed with other provisions regarding the land office. This prohibition was made more explicit in 1850 by an act which provided:

No grant issued by the register, either in consequence of any survey already made or which may hereafter be made, shall be valid or effectual in law . . . to pass any estate or interest in lands which are a common under chapter sixty-

---

[5] Code § 62.1-1 reads in part:

All the beds of the bays, rivers, creeks and the shores of the sea within the jurisdiction of this Commonwealth, and not conveyed by special grant or compact according to law, shall continue and remain the property of the Commonwealth of Virginia, and may be used as a common by all the people of the State for the purpose of fishing and fowling, and of taking and catching oysters and other shellfish, subject to the provisions of Title 28.1, and any future laws that may be passed by the General Assembly.

two of said Code, but every grant for any such lands shall be absolutely void.

Acts 1850-51, ch. 41. This prohibition now appears as Code § 41.1-3.

 Thus, the reservation from grant of common lands made in 1780, and extended to include all of the Atlantic shore in 1873, continues to the present day. The only period these statutes were not in effect was from 1865 to 1871. During this time, the "Reconstruction Government" repealed the prohibition found in the land grant act and ordered the sale of all lands previously reserved as a common. Acts 1865-66, ch. 44. This act was repealed and the previous law reinstated in 1871. Acts 1870-71, ch. 79. The trial court found that none of the land in question was granted during this six-year period.

 A second statute affecting the shores of the sea was first passed in 1819. This act provided:

That hereafter the limits or bounds of the several tracts of land lying on the Atlantic ocean, the Chesapeake bay, and the rivers and creeks thereof within this Commonwealth, shall extend to ordinary low water mark; and the owners of said lands shall have, possess and enjoy exclusive rights and privileges to, and along the shores thereof, down to ordinary low water mark: *Provided*, . . . that nothing in this section contained shall be construed to prohibit any person or persons from the right of fishing, fowling and hunting on these shores of the Atlantic ocean, Chesapeake bay and the rivers and creeks thereof, within this Commonwealth, which are now used as a common to all the good people thereof; nor to repeal the sixth section of an act, entitled, "an act for reducing into one the several acts concerning the land office; [the 1792 version of the 1780 act]. . . ."

Acts 1818-19, ch. 28. The present version of this act is found in Code § 62.1-2.[6]

---

[6] Code § 62.1-2 reads in pertinent part as follows:

Subject to the provisions of the preceding section (§ 62.1-1) the limits or bounds of the several tracts of land lying on such bays, rivers, creeks and shores, and the rights and privileges of the owners of such lands, shall extend to the mean low-water mark, but no farther, unless where a creek or river, or some part thereof, is comprised within the limits of a lawful survey.

The 1819 act preserved the right of the public to fish, fowl and hunt on land then used as a common. The trial court made a factual finding that the beaches of Hog Island had been used as a common for over 200 years. Applying this finding and the 1819 act, the court held the Conservancy had title to those parts of the shore granted prior to 1873, subject to the public's right to fish, fowl and hunt. Relying on the 1873 amendment to the 1780 act, the court ruled that any grant of the Atlantic shore of Hog Island made after 1873 was void, the Conservancy having no right to this land.

For the reasons stated in Part I of this opinion, we affirm the finding of the trial court that the beaches of Hog Island have been used as a common. Given this finding, however, the court erred in applying the 1819 act. The 1819 act, by its terms, was not meant to modify the 1780 act. Instead, the 1819 act extended to low water mark only the boundary of those grants made prior to 1780.[7] *Miller*, 159 Va. at 950-51, 166 S.E. at 566. We hold that under the 1780 act any grant of the Atlantic shore of Hog Island made after the act's enactment is void, and title remains in the Commonwealth, for use by the public as a common. Any grant made prior to 1780 is valid and is extended to low water mark by the 1819 statute, but the shore is subject to the public's right to fish, fowl and hunt.[8]

The Conservancy argues that, regardless of who has title to the shore, the rights of the public to use the area must be regulated so as to preserve the commons' resources for future generations. Bradford concedes the Commonwealth has the power to regulate the use of common lands and indeed states such management and conservation is "clearly desirable." This regulation may include limitations on the use of motor vehicles, an area of great concern to the Conservancy. As Bradford argues, the very statutes at issue in this case show the Commonwealth's policy for over 200 years to protect and preserve the common lands, and there is nothing to indicate this policy will not continue.

With regard to those areas of the beach which the public has a right to use, pursuant to the 1819 act, but to which the

---

[7] We express no opinion on the effect of the 1819 act on areas not historically used as a common.

[8] For the reasons stated in Part I, we reject the Conservancy's arguments that Code §§ 8.01-238 and 41.1-6 preclude a challenge to its title to the beach, and that the 1780 and 1819 acts are unconstitutional.

Conservancy has title, the Conservancy argues that the public's right to these areas is strictly limited to those uses mentioned in the statute (fishing, fowling and hunting) and may not be extended to include other recreational pursuits. We agree that the public's right to these areas of beach is limited to the specified uses and the necessary incidents thereof. *See, e.g., Opinion of the Justices*, 365 Mass. 681, 686, 313 N.E.2d 561, 566 (1974).

### III.

As part of its effort to protect the ecology of Hog Island, the Conservancy banned the use of all motor vehicles. Bradford argues he has the right to use all roads on the island, including the beach. The trial court held the beach-access road and the beach had become public roads by implied dedication,[9] but that Bradford had no right to use the north-south road, which the court found to be "a seldom used passageway" which followed no fixed route. We will reverse the court's ruling with respect to the beach-access road and the beach, but affirm it as to the north-south road.

In order for a road to be dedicated to the public, there must be an offer made by the landowner and an acceptance by the public. *Harris* v. *The Commonwealth*, 61 Va. (20 Gratt.) 833 (1871). While a dedication may be implied from the acts of the owner, these acts must be unmistakable to show the intention of the landowner to permanently give up his property. *West Point* v. *Bland*, 106 Va. 792, 794, 56 S.E. 802, 804 (1907).

This Court has long recognized that what may amount to a dedication in an urban area will not serve the same purpose in a rural one. *Commonwealth* v. *Kelly*, 49 Va. (8 Gratt.) 632 (1851). This is because landowners in rural areas frequently allowed roads to be opened through their property without intending a dedication to the public. *Id.* at 635. Just as important, the government might not have any intention to accept the road and be responsible for its maintenance. Thus, before a rural road can be dedicated,

---

[9] The trial court also held the Coast Guard obtained title to the beach-access road when it purchased land for its northern station and that the title passed to the Machipongo Club. Since the Club is not a party to this suit, its rights in the road are not in issue, except to the extent the plaintiffs claim under these rights. However, to the extent the plaintiffs claim their rights through the Club, they are in privity with it and are barred from relitigating this issue, which was decided against the Club by the Fourth Circuit. *Kesler* v. *Fentress*, 223 Va. 14, 286 S.E.2d 156 (1982).

there must be a formal acceptance by the public. *Lynchburg Traction Co.* v. *Guill*, 107 Va. 86, 57 S.E. 644 (1907).

While the plaintiffs presented evidence the roads in question were used by the public, there was no evidence the county ever accepted these roads, either by making an entry on the public records or by assuming the duty to maintain them. The trial court therefore erred in holding the beach-access road and beach were public roads available for use by the plaintiffs.

Bradford argues the normal test of dedication cannot apply on Hog Island because no governmental structure existed there. However, Hog Island, at all times relevant to this suit, was part of Northampton County. Evidence was presented that the county condemned land for part of the cross-island road, and that in the 1930's public funds were expended for its maintenance. This evidence rebuts Bradford's assertion that the island was without a government.

As an alternative theory, Bradford argues those plaintiffs who are landowners on the island have acquired "reciprocal or quasi-easements" in the north-south road and the beach. The trial court rejected this theory with regard to the north-south road by finding that no fixed road existed, and any rights the plaintiffs had to travel over the uplands were merely permissive. We affirm this ruling. Moreover, this theory contradicts the plaintiff's undisputed evidence that all the roads were used at will by the public. The use of a way along with the rest of the public cannot substantiate a claim of a private right in the way. *Stanley* v. *Mullins*, 187 Va. 193, 200, 45 S.E.2d 881, 885 (1948).[10]

## IV.

In conclusion, we affirm the trial court's holding that the Conservancy has no interest in the marshes of Hog Island, these areas being a common on which Bradford and others may fish, fowl and hunt. We further hold the Conservancy has no title to any part of the Atlantic beach granted by the Commonwealth

---

[10] Failing all else, the plaintiff-landowners argue they have an easement of necessity in either the north-south road or the beach in order to get to their property. However, they failed to produce evidence to support this claim. None of the plaintiffs showed they shared a common grantor with the Conservancy or that the Conservancy's land stood between their land and the public cross-island road. Indeed, only one of the plaintiffs produced evidence of the location of his land on the island. *See Jennings* v. *Lineberry*, 180 Va. 44, 21 S.E.2d 769 (1942).

after 1780, these lands also being held as a common. The Conservancy would have title to any of the beach which stems from a grant before 1780, subject to the public's right to fish, fowl and hunt. Finally, Bradford has no right to use the beach-access road, north-south road or the beach as a public or private way. The trial court's injunction prohibiting Bradford and the Conservancy from interfering with each other's rights will be modified to be consistent with the views expressed herein.

*Affirmed in part;*
*reversed in part;*
*and final judgment.*