MICHAEL J. RAUSEO, trustee,[1] vs. COMMONWEALTH.

No. 04-P-1514.

Suffolk. June 15, 2005. - December 1, 2005.

Present: DOERFER, COHEN, & TRAINOR, JJ.

*Real Property,* Restrictions, Wharf, Littoral property. *Due Process of Law,* Commonwealth's interest in tidelands. *Collateral Estoppel. Estoppel.*

In a civil action to remove an encumbrance from the registration certificate for a parcel of littoral property consisting of uplands and filled tidal flats below the mean high water mark of a nearby river, the judge correctly concluded that no rights in the public remained in the property based on the Colonial Ordinance of 1641-1647, where the filling and use of the property had no material impact on the navigability of the river [222-223]; that nothing in the applicable wharfing statutes, St. 1852, c. 105, and St. 1855, c. 481, implied that the title to such land was subject to a perpetual general condition subsequent that the land be used for purposes relating to navigation [223-224]; that the public trust doctrine did not apply because the property was not submerged land [224-226]; and that the plaintiff's claim was not barred by collateral estoppel [226].

CIVIL ACTION commenced in the Land Court Department on April 12, 2002.

The case was heard by *Karyn F. Scheier,* J., on a motion for summary judgment.

*Joseph Callanan,* Assistant Attorney General, for the Commonwealth.

*Eric W. Wodlinger* (*Sarah H. Broughel* with him) for the plaintiff.

*John A. Pike,* for Conservation Law Foundation, amicus curiae, submitted a brief.

DOERFER, J. The Commonwealth asserts in this appeal that a parcel of land owned by the plaintiff is subject to rights in the public arising out of the history of the land as a tidal flat and

[1]Of the Suffolk/Medford Realty Trust.

the enactment of the Mystic River wharfing statutes in the mid-nineteenth century (St. 1855, c. 481, and St. 1852, c. 105). We affirm the decision of the Land Court that such rights have terminated by the lawful filling of the tidal flats in question and that wharfing statutes did not create broad public rights in the parcel which persist to this day.

*Background.* The land in question, lot C, is an inland parcel that is set back 675 feet from the Mystic River in Charlestown. Several industrial buildings lie between lot C and the Mystic River. Lot C includes a small area of historic uplands next to Medford Street and filled tidal flats below the mean high water mark of the Mystic River. All of the tidal flats are landward of the historic low water mark of the Mystic River and are less than one hundred rods below the historic high water mark of the Mystic River. Lot C extends north from Medford Street to a railroad layout approximately 675 feet south of the Mystic River. A bulkhead lies north (seaward) of lot C. The original parcel from which lot C was created extended further outward on the flats to the bulkhead. All of the former flats in lot C have been lawfully filled. Not all of the flats in lot D, which is the remainder of the larger parcel from which lots C and D were created, have been filled.

The plaintiff's predecessors in title trace their ownership to a time well before the enactment of the Mystic River wharfing statutes. As such, they were invested with the rights conferred by the Colonial Ordinance of 1641-1647, which gave them title to the flats from the mean high water mark to the mean low water mark or one hundred rods seaward, whichever was the lesser distance. This title to the flats was subject, however, to rights in the public to fishing, fowling and navigation. The Commonwealth asserts that these rights of the public or other inchoate rights still persist and burden lot C. The plaintiff claims that the lawful filling of the flats has extinguished these rights of the public.

The Mystic River wharfing statutes[2] formed the Mystic River Corporation, which consisted of the city of Charlestown and other owners of the land in question. Their effect was to authorize,

---

[2]The original statute was St. 1852, c. 105. It was amended by St. 1855, c. 481, which contains the operative language now relevant.

among other things, the filling of tidal flats that were beyond the reach of the rights granted by the Colonial Ordinance (i.e., beyond one hundred rods from mean high water), the filling of tidal flats owned by the Commonwealth, and the filling of certain submerged lands. As to such lands, the acts constituted a conveyance of the land and grant of a right to fill that land. See *Treasurer & Recr. Gen.* v. *Revere Sugar Refinery*, 247 Mass. 483, 489 (1924). Such lands are to be distinguished from the lands already owned by the plaintiff's predecessors in title.

With the benefit of various extensions, the Mystic River Corporation completed the filling of the flats up to the bulkhead within the time allotted. A warehouse was constructed on land now forming part of lot C. A wharf was extended seaward into a portion of the unfilled flats.

Before it was subdivided into lots C and D, the land (the registration parcel) was registered in a Land Court proceeding in 1907. The registration certificate stated that the registration parcel is subject to "any and all public rights legally existing in and over the same below mean high water mark." This is now referred to as the waterways encumbrance by the parties.

In 1912, lot C was created as a separate lot when it was subdivided from the registration parcel and conveyed to the Terminal Storage Company, the predecessor in title of the plaintiff. When the land was divided into lots C and D, the waterways encumbrance language was retained in the separate registration certificates relating to both lots C and D. By this time, all of the flats on lot C had been filled and a warehouse constructed thereon.

In 2002, the plaintiff brought this proceeding to correct the certificate pertaining to lot C, seeking to remove the waterways encumbrance from the schedule of encumbrances. The Commonwealth opposed the plaintiff's complaint and asserted that public rights still persisted in lot C. It argues not only that public rights persist under the Colonial Ordinance but also that public rights were created by the wharfing statutes and that lot C is subject to the public trust doctrine.[3] We take up these

---

[3]The Commonwealth also makes an estoppel argument that is discussed *infra.*

claims in order, adding reference to such additional facts as are necessary to the analysis.

*Claims under the Colonial Ordinance.* Under the Colonial Ordinance of 1641-1647,[4] a littoral owner on a tidal stream holds title to the flats between mean high water and mean low water (if not exceeding 100 rods but otherwise to the 100 rod limit).[5] The owner was only obliged not to interfere with the public's right to navigate the stream in question or to interfere with the public's rights of fishing and fowling. The owner was entitled to fill the flats and thereby to exclude the public completely (including for the purpose of fishing and fowling) so long as he did not unreasonably interfere with navigation. *Opinion of the Justices*, 383 Mass. 895, 902 (1981). The right to navigation is also not necessarily a claim on the tideland itself, but rather a protection of access for those upstream. For example, the Supreme Judicial Court has held that the public did not have the right to use a private beach for bathing, stating that the owner's interest was subject to "that portion between high and low water mark, to the easement of the public for the purposes of navigation and free fishing and fowling, and of passing freely over and through the water *without the use of the land underneath*, wherever the tide ebbs and flows" (emphasis added). *Butler* v. *Attorney Gen.*, 195 Mass. 79, 84 (1907).

---

[4] In relevant part, the ordinance read:

> "Every Inhabitant who is an housholder shall have free fishing and fowling in any great ponds, bayes, Coves and Rivers, so farr as the Sea ebbs and flowes, within the precincts of the towne where they dwell, unless the freemen of the same Town or the General Court have otherwise appropriated them. . . . The which clearly to determine, It is Declared, That in all *Creeks*, *Coves* and other places, about and upon *Saltwater*, where the Sea ebbs and flowes, the proprietor of the land adjoyning, shall have propriety to the low-water mark, where the Sea doth not ebb above a hundred Rods, and not more wheresoever it ebbs further. Provided that such proprietor shall not by this liberty, have power to stop or hinder the passage of boates or other vessels, in or through any Sea, Creeks, or Coves, to other mens houses or lands."

The Book of the General Lawes and Libertyes 50 (1649), quoted in *Opinion of the Justices*, 365 Mass. 681, 685 (1974).

[5] For a comprehensive overview of the history of Massachusetts tideland law, see generally *Opinion of the Justices, supra*; *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 378 Mass. 629 (1979).

Occupation of the tidal flats "is always on condition that the navigation *of the stream* be not materially impaired" (emphasis added). *Boston Waterfront Dev. Corp.* v. *Commonwealth,* 378 Mass. 629, 637 (1979), quoting from *Kean* v. *Stetson,* 5 Pick. 492, 495 (1827). Here, there is no claim that the filling and use of lot C has any material impact on the navigability of the Mystic River. Thus, as the plaintiff correctly argues, no rights in the public based on the provisions of the Colonial Ordinance remain.

*Claims under the wharfing statutes.* Under the applicable wharfing statutes the plaintiff's predecessor in title was authorized to fill land described therein to extend wharfs and to construct warehouses and charge wharfage fees. The filling and construction had to be completed within deadlines set by the statute as modified by subsequent statutes. These deadlines were met.

The Supreme Judicial Court has had occasion to construe these particular statutes in another controversy. In *Treasurer & Recr. Gen.* v. *Revere Sugar Refinery,* 247 Mass. at 491, the court agreed that a general law relating to charging fees for displacement of tidewater did not apply to the lands described in St. 1855, c. 481, because that act constituted a grant free of any condition other than that the land be filled and certain structures be completed within certain time limits. It was beyond the reach of the Legislature to impose further fees for displacement, especially where the statute imposed duties on the grantees to make compensating excavations for the filled land.

The Commonwealth argues that the authority given by the wharfing statutes to construct warehouses and wharfs and to collect wharfage implies that the title to the land was subject to a perpetual general condition subsequent that the land be used for purposes relating to navigation.[6] The Commonwealth further bolsters its argument by referring to the establishment of commissioners to oversee the work of filling and constructing improvements. This argument concludes that the wharfing statutes created a public interest in the flats which is distinct from the public's rights under the Colonial Ordinance. In fact,

---

[6] The Commonwealth's interest in this parcel was kindled by the plaintiff's proposal to rehabilitate the old warehouse, which has stood vacant on lot C for the last twenty years, into a living and work space for artists.

the Commonwealth argues directly that the public's right to have the land used for purposes of navigation springs from the wharfing statutes and passes over the origin of those rights in the title held by the plaintiffs under the Colonial Ordinance.

This argument reads too much into the language used in the wharfing statutes. As applied to lot C, it would derogate the title already held as of the enactment of the statutes by the plaintiff's predecessors which was encumbered by no such condition subsequent. They already had the right to fill their flats. See *Treasurer & Recr. Gen.* v. *Revere Sugar Refinery*, 247 Mass. at 491. The acts were needed only to enable the land beyond the low water mark (or one hundred rods) to be filled and improved. We need not explore the extent of the lingering retained rights of the public with respect to such lands. They form no part of lot C. Furthermore, the *Revere Sugar Refinery* case did not purport to consider the general consequences of the language in the wharfing statutes relating to the construction of warehouses and related uses of the filled land and wharves. It was concerned only with the question whether the owners of the filled land (the predecessors of the plaintiff) had met all the conditions which impinged on their title, viewed as a fee subject to conditions subsequent (they had), and thus were not subject to the tidewater displacement fee regime of G. L. c. 91, § 21.

This is not to say that the Commonwealth is not entitled to enact and enforce land use regulations in the usual fashion. But those interferences with the plaintiff's private property for the benefit of the public derive from general legislative and constitutional powers and do not arise out of the nature of the title held by the plaintiff.

*Application of the public trust doctrine.* Much of the Commonwealth's broad argument about residual public interest in filled land arises from the law relating to submerged lands. See *Trio Algarvio, Inc.* v. *Commissioner of the Dept. of Envtl. Protection*, 440 Mass. 94, 97 (2003) (the public interest "may be extinguished only, in the case of tidal flats, by lawful filling, or, in the case of submerged land, by express legislative authorization"). Lot C never consisted of submerged land. It was always either upland or, before it was filled, tidal flats

within one hundred rods of the high water mark and never submerged around the clock.[7]

Land below the historic low water mark "is not, like ordinary private land held in fee simple absolute, subject to development at the sole whim of the owner, but is impressed with a public trust." *Boston Waterfront Dev. Corp.* v. *Commonwealth*, 378 Mass. at 649. This trust requires that the submerged land be used "only for a purpose approved by the Legislature as a public use." *Ibid.* Furthermore, if the land is later used for another, non-approved use, the State may take the property back; this condition subsequent is allowed because of the Commonwealth's particularly strong interest in submerged land — it is considered to be part of the public interest, and thus subject to more stringent protections. *Id.* at 650.

The Commonwealth does not base its opposition to the plaintiff's claim on any theory that the south channel extended onto the registration parcel. However, it is undisputed that, even if the south channel extended that far, it did not extend into lot C. There is no support for an argument that the restrictions placed on the use of submerged land extend to all land in the registration parcel, and not just to that part seaward of the historical low water line. We note that in *Boston Waterfront Dev. Corp.* v. *Commonwealth, supra* at 630, the corporation brought a petition "to register title to *a certain parcel*" of land that included land both above and below the low water line (emphasis added). The Supreme Judicial Court allowed the parties to stipulate that the corporation owned the land above the low water line in fee, and resolved separately the status of title on the land below the low water line. This suggests that the submerged land restrictions cannot be imposed on land that was not submerged, even if it is part of a parcel that included submerged land. We conclude that the stringent restrictions placed on the private use of submerged land never applied to the land that is now lot C, and thus there is no question presented as to whether such a restriction could be severed.

---

[7]Before the filling of land authorized by the Mystic River wharfing statutes, the Mystic River had a south channel, which was submerged even at low tide. The Land Court did not resolve the question whether the historical south channel extended into the registration parcel, holding that, even if the channel did extend that far, it would only encroach on lot D.

The Commonwealth also argues that lot C is subject to the prior public use doctrine. See *Opinion of the Justices*, 383 Mass. at 905. But that entire argument, which we need not rehearse, is based on the false premise that lot C had its antecedents as public land. The limited public rights under the Colonial Ordinance, which are clearly terminable by lawful filling (subject to not materially interfering with navigation) are clearly not of the type which can claim perpetual residual life in the form of some other public use.

*Collateral estoppel.* The Commonwealth argues that the plaintiff's claim is barred by collateral estoppel, since the 1912 subdivision did not include a proceeding to strike the waterways encumbrance from the title to lot C. We agree with the Land Court that the plaintiff's claim is not barred by collateral estoppel, in that the issue of the application of the waterways encumbrance to lot C was not specifically adjudicated in the 1907 registration, as the present circumstances (the separate identity of lot C from the remainder of the registration parcel) did not exist. This case is thus distinguishable from *McCarthy* v. *Oak Bluffs*, 419 Mass. 227, 230 (1994), where the town had entered an appearance and objected to the registration in question. Here, the 1907 registration was uncontested (although the Commonwealth had notice of it).

*Conclusion.* None of the potential sources of public rights in lot C actually retains the public rights that once existed in the land below the high water mark, and the Commonwealth has received compensation for the loss of those public rights through the excavation mandated by the Mystic River wharfing statutes. Since the plaintiff's claim was not barred by collateral estoppel, we affirm the decision of the Land Court.

*Judgment affirmed.*