## Richmond

COMMONWEALTH OF VIRGINIA, ET AL.

V.

DEBORAH G. MORGAN, ET AL.

June 17, 1983.

Record No. 801639.

Present: All the Justices.

*Frederick S. Fisher, Assistant Attorney General (Marshall Coleman, Attorney General; Walter H. Ryland, Chief Deputy Attorney General; Perkins Wilson, Assistant Attorney General,* on briefs), for appellants.

*Roger G. Hopper* for appellees.

*Amicus Curiae: Curles Neck Farm, Inc. (David E. Evans; McGuire, Woods & Battle,* on brief), for appellees.

COMPTON, J., delivered the opinion of the Court.

This is a dispute between the Commonwealth and several individual landowners about the title to certain submerged land, containing oyster grounds, under a tributary of the Rappahannock

River. The question is whether royal patents conveyed the creek bottom of Carter's Cove.

The cove, a navigable body of water, is the west branch of Carter's Creek in Lancaster County. Carter's Creek, near Irvington, enters the Rappahannock from the north just east of a point where the Corrotoman River flows into the Rappahannock.

In November of 1979, Deborah G. Morgan and others filed a motion for declaratory judgment in equity against the Commonwealth of Virginia, Virginia Marine Resources Commission, and F. H. Daniel Cook.[1] The plaintiffs alleged they are the owners of certain parcels of land lying on Carter's Cove. They also asserted they own certain submerged lands, oyster grounds, or bottoms, lying under the waters of Carter's Cove and adjacent to their respective highland parcels. They further alleged they were conveyed their respective submerged lands by deeds of record, as were their predecessors in title. Plaintiffs trace their record titles in an unbroken chain back to a Patent from Sir William Berkeley, Knight Governor of Virginia, to John Carter dated August 15, 1642, the same having been reincorporated into two other Patents bearing dates of 1653 and 1663, all of which are recorded in Patent Books in the Virginia State Archives.[2]

The plaintiffs also alleged that the Commonwealth, through the Virginia Marine Resources Commission, has asserted ownership of the bottom of Carter's Creek by seeking to charge one of the plaintiffs a royalty for his existing oyster shell pile and the construction of a bulkhead beyond the mean low water mark; and by proposing to lease the bottom of Carter's Cove to defendant Cook. Stating an actual controversy exists among the parties concerning the ownership of the submerged lands, oyster grounds, or bottom of Carter's Cove, the plaintiffs sought a judgment declaring them to be owners of the subject property, and an injunction prohibiting

---

[1] The other plaintiffs are William C. Morgan, Russell H. Kellum, Rubinette A. Kellum, Hazel C. George, Myrtle Kellum, George A. Blake, W. F. Morgan & Sons, Inc., Walter H. Abbott and Earl W. Abbott, t/a Abbott Brothers, C. Franklin George, Ada Louise George and Nellie B. George.

[2] The governors issuing the patents in question served during the following periods. Sir William Berkeley succeeded Sir Francis Wyatt as Governor of the Colony in Virginia in February of 1642, and continued to March 12, 1652. Richard Bennett, first governor under the provisional government, served from April 30, 1652 to March 31, 1655. Governor Berkeley served again as governor from March of 1660 until April 27, 1677. *A Hornbook of Virginia History*, Virginia State Library Publication, No. 25, at 104 (1965). *Cf.* A. Embrey, *Waters of the State* 40, 43, 48 (1931).

the defendants from denying plaintiffs their ownership and control over the premises.

Cook filed an answer stating he owned a substantial amount of property fronting on Carter's Cove. He joined in the prayer of the plaintiffs' motion that the ownership of the bed of Carter's Cove be determined, and asked to be dismissed as a party defendant.

The Commonwealth and the Commission filed a demurrer which was overruled. Subsequently, they filed an answer asserting ownership of the property in question. Following an ore tenus hearing, the trial court ruled in favor of the plaintiffs. We awarded the Commonwealth and the Commission (hereinafter the Commonwealth) an appeal from the July 1980 final decree. The decree specified that the plaintiffs are seised, possessed and own their respective submerged lands, oyster grounds, or bottom of Carter's Cove free of any dominion, ownership, or control by the Commonwealth, subject to the limitation that the waters over these submerged lands remain highways for passage and navigation by the public.

At the hearing, plaintiffs filed as exhibits, among other things, copies of the three patents conveying 2,160 acres of land; copies of all the mesne conveyances in the chains of title; the Carter family tree; abstracts of title; and a copy of an 1815 plat of the partition of Corotoman, the estate of John Carter, who was the father of the noted Robert "King" Carter. The only testimony was by two plaintiffs and Charles E. Tomlin, Jr., a certified land surveyor called by the plaintiffs. Tomlin, experienced in marine and riparian surveys as well as in surveying colonial patents, testified that Carter's Cove lies within the boundaries of the colonial patents and the 1815 plat.

On appeal, the Commonwealth contends, first, the trial court erred in finding that the language of the patents demonstrates an intention to convey not only the highlands described but also the bed of Carter's Cove. Relying on the common-law presumption that the king intended to convey only to the high-water mark unless a contrary intention was expressly or impliedly shown, *Miller* v. *Commonwealth,* 159 Va. 924, 929, 166 S.E. 557, 558 (1932), the Commonwealth says there is no reference in the patents to inclusion of any submerged lands or any other land below the high-water mark. The State notes the documents refer to the boundary as running "by" or "along" the Rappahannock River, the 1653 patent containing a call going "along" Carter's

Creek. Thus, the argument goes, there is nothing in the patents to rebut the presumption that the boundary of the grant was the high-water mark. We disagree.

The Commonwealth offered no evidence. Based on Tomlin's testimony as corroborated by the exhibits, the chancellor made a finding of fact that the bed of Carter's Cove lies within the boundaries of the patents. There was credible evidence to support that finding and, according to settled principles, such conclusion is binding on appeal.[3]

■ Second, the Commonwealth contends that even if the royal governors as the King's agent intended to make a grant of the bed of Carter's Cove, nevertheless no title to the bottom passed because such act was beyond the authority of the King. Resolution of this issue, of course, necessitates an analysis of English common law.

The State argues that the crown had no power to grant the bottoms of navigable waters to private individuals thus interfering with the public right of fishing or oystering. The Commonwealth contends that after royal power was limited by Magna Carta, such grants could be made only with the consent of Parliament, and there is no record of such parliamentary consent in this case.

We disagree with the Commonwealth's contentions. We hold that the King had the power, acting through the royal governors, to grant the bed of Carter's Cove to private persons.

Of course, the original Charter issued in 1215 was not in force in England when these grants were made. W. McKechnie, *Magna Carta* 139-64 (1914). For the text of the original document in English, *see* A. Howard, *Magna Carta,* 31-35 (1964). The most important of the Charters from a constitutional standpoint is the Magna Carta of Edward I (1297) (25 Edw. 1). 8 *Halsbury's*

---

[3] Ordinarily, the question whether land in controversy is within the boundaries claimed is a matter of fact upon which witnesses may state their knowledge, but upon which experts may not state an opinion. *Holleran* v. *Meisel,* 91 Va. 143, 150, 21 S.E. 658, 660 (1895). It is proper, however, for expert surveyors to examine deeds, and other documentary evidence, and to state from their knowledge whether the land in controversy is within the boundaries of a patent. *Id.* The defendant's ground of objection to Tomlin's testimony, overruled by the trial court, was that in fixing the boundaries Tomlin was testifying "to the ultimate issue in this case." No objection specifying that Tomlin's testimony was inadmissible opinion evidence, violative of the foregoing rule, was made in the trial court, although such a contention was mentioned during oral appellate argument. Even assuming the surveyor's testimony was pure opinion, we will not notice such a contention for the first time on appeal. Rule 5:21.

*Laws of England* § 908, n.2 (4th ed. 1974). But we have found no explicit provision in any version of Magna Carta prohibiting the King from making grants of the bottoms of any rivers. Moreover, the Commonwealth has not called to our attention any specific chapter in any one of the versions that supports his position. And, opposed to the contention of the Attorney General, who relies heavily on the case of *Martin* v. *Waddell,* 41 U.S. (16 Pet.) 367 (1842), the Supreme Court has not held to the contrary. Indeed, the Court specifically declined to decide the issue in *Martin,* a dispute over land lying beneath navigable waters in New Jersey. The Court, speaking through Chief Justice Taney, said:

> "We do not propose to meddle with the point which was very much discussed at the bar, as to the power of the king since Magna Charta to grant to a subject a portion of the soil covered by the navigable waters of the kingdom, so as to give him an immediate and exclusive right of fishery either for shell fish or floating fish within the limits of his grant." 41 U.S. (16 Pet.) at 410.

We recognize that the question whether the King had the power following Magna Carta unilaterally to grant such bottoms has been the subject of serious debate by English writers. Nevertheless, as we shall demonstrate, Virginia already has aligned herself with those authoritative commentators who have concluded that the common law of England since Magna Carta sustains the King's authority to have made such grants.

Lord Chief-Justice Hale in his Treatise *De Jure Maris,* published in Hargrave's Law Tracts (Dublin 1787), discusses in Part 1, Chapter 5, "[t]he right which a subject may have in the creeks or armes of the sea, and how it may be acquired." Lord Hale wrote:

> "Although the king hath *prima facie* this right in the armes and creeks of the sea *communi jure,* and in common presumption, yet a subject may have such a right.
> "And this he may have two ways.
> "1st. By the king's charter or grant; and this is without question. The king may grant fishing within a creek of the sea, or in some known precinct that hath known bounds, though within the main sea. He may also grant that very interest

itself, viz. a navigable river that is an arm of the sea, the water and soil thereof." 1 F. Hargrave, *Law Tracts* at 17.

*De Jure Maris* has been recognized by this Court as the "best and most authoritative Treatise" on the power of the sovereign over streams, and "indeed [the work] from which all who have written since seem to have drawn." *Crenshaw* v. *Slate River Co.,* 27 Va. (6 Rand.) 245, 260 (1828).

Not only did authoritative English writers recognize the King's power to grant submerged lands for private use, our prior cases interpreting the common law of England have acknowledged the principle. For example, in *McCready* v. *Commonwealth,* 68 Va. (27 Gratt.) 985, *aff'd,* 94 U.S. 391 (1876), a case factually inapposite but instructive upon the common-law principles, defendant, a nonresident of Virginia, was convicted of unlawfully planting oysters in the waters of the Ware River in Gloucester County. He contended the state criminal statute infringed his rights under the federal constitution. The question was whether the states, within their territorial limits, could exercise jurisdiction over navigable waters and the land beneath. In affirming the conviction, this Court explicitly recognized the validity of crown grants of the beds of navigable waters. The Court indicated that because there was no private grant to the land in question the control by the Commonwealth of the bottom to defendant's exclusion was not unconstitutional. In the course of the opinion, the Court, drawing from a decision of the United States Supreme Court, said that property beyond the low-water mark belongs to the state within whose territory it lies "subject to any lawful grants of that soil by . . . the sovereign power which governed its territory before the [D]eclaration of [I]ndependence." 68 Va. (27 Gratt.) at 987.

■ Private grants of submerged lands have been recognized not only by the common law of England and the decisions of this Court, but the General Assembly has codified this concept. Code § 62.1-1 provides that all beds of the bays, rivers, and creeks within the territorial jurisdiction of the Commonwealth, "*not conveyed by special grant* or compact according to law" (emphasis added) shall be the property of the State. *See generally Bradford* v. *Nature Conservancy,* 224 Va. 181, 294 S.E.2d 866 (1982). Thus, that statute acknowledges that private rights may properly be acquired by lawful grants.

Because what we have said to this point disposes of the appeal, it is unnecessary for us to decide an ancillary issue raised by the Attorney General, *viz.*, whether the 1815 plat of partition qualifies as a "lawful survey" within the meaning of Code § 62.1-2. The statute provides, subject to the provisions of § 62.1-1, that the limits or bounds of tracts of land lying on bays, rivers, creeks, and shores shall extend to the mean low-water mark, unless a creek or river, or some part of it, is comprised within the limits of a "lawful survey," as defined in the statute. Inasmuch as the boundaries of the grants in question have been established without the aid of the 1815 plat, we need not discuss whether the property lines may also have been established by a plat which, as here, was prepared for private individuals years after the original grants.

For these reasons, the decree appealed from will be

*Affirmed.*