Present: Carrico, C.J., Compton, Lacy, Hassell, Keenan, and Koontz, JJ., and Whiting, Senior Justice

CHARLES A. KRAFT, JR.

OPINION BY
v.   Record No. 951678   SENIOR JUSTICE HENRY H. WHITING
September 13, 1996
ETHRIDGE E. BURR, ET AL.

FROM THE CIRCUIT COURT OF ALLEGHANY COUNTY
Duncan M. Byrd, Jr., Judge

In this appeal, the primary issues are whether letters of patent from two English monarchs, acting through their royal governors, could and did grant exclusive fishing rights in a navigable river, and, if so, whether the complainants are the successors in title to the patentees and can assert those rights to prohibit the public from fishing in the part of the river running over their land.

Ethridge E. Burr and a number of other persons (the property owners) claim to own the stream beds under parts of the Jackson River in Alleghany County adjacent to their property. They also claim exclusive fishing rights in that portion of the river above those beds. These claims originate in two 18th century Crown patents to the property owners' predecessors in title. Each patent conveyed property on both sides of the river, and included the stream beds in the metes and bounds descriptions.

Fishing rights were expressly conveyed in a 1750 patent from George II to William Jackson, a predecessor in title to Ethridge E. and Hazel Burr and an alleged predecessor in title to Bobbie E. and Nancy A. Witt and Robert M. and Bettie H. Loving as to part of the Lovings's property (collectively, the Jackson claimants). There is a dispute whether fishing rights were

conveyed in a 1769 patent of the land immediately northeast of the Jackson patent from George III to Richard Morris, an alleged predecessor in title of the Lovings's remaining property, and a predecessor in title of the remaining property owners (collectively, the Morris claimants).[1]

The property owners brought this suit against Charles A. Kraft, Jr., to enjoin him from fishing or wading "in the waters of Jackson River running over plaintiffs' land." They also sought a judicial declaration of their ownership of the subaqueous land described in their deeds and of their exclusive fishing rights in the river running over that land.[2]

The evidence at an ore tenus hearing indicated that Kraft, a professional fishing guide, had fished in the Jackson River adjacent to land upon which the property owners had posted signs prohibiting fishing. All the property owners but the Witts and Lovings traced title to either the Jackson or Morris patents. The Witts and Lovings, who were in possession of stream beds adjacent to their land, claimed title thereto simply by virtue of earlier deeds from previous owners. Concluding that the property owners owned the submerged land and exclusive fishing rights therein, the chancellor enjoined Kraft from wading and fishing in

---

[1] The remaining property owners are Thomas G. Botkins, Jr., Sarah Botkins Crosier, Alan S. Botkins, and Robert W. Botkins, with their respective spouses, Phyllis N. Botkins, Bobby P. Crosier, Joyce B. Botkins, and Elizabeth G. Botkins having marital interests.

[2] Four of the original 18 complainants nonsuited their cases.

the river over that land.

We awarded Kraft an appeal.  He renews the contentions he made before the chancellor.

First, Kraft contends that any title the Crown allegedly granted in the stream beds could not have included exclusive fishing rights in the part of the river flowing over those beds.  According to Kraft, under early English common law the king held the fishing rights of navigable streams jus publicum, i.e., in trust for the public, and thus he could not convey those rights to private persons.  Kraft bases his argument upon conclusions he draws from a treatise of Lord Chief Justice Hale entitled De Jure Maris et Brachiorum Ejusdem (Concerning the Law of the Sea and its Arms), published in Hargrave's Law Tracts (Dublin 1787).  This treatise "has been recognized by this Court as the 'best and most authoritative [t]reatise' on the power of the sovereign over streams, and 'indeed [the work] from which all who have written since seem to have drawn.'"  Commonwealth v. Morgan, 225 Va. 517, 523, 303 S.E.2d 899, 902 (1983)(quoting Crenshaw v. Slate River Co., 27 Va. (6 Rand.) 245, 260 (1828)).

We think that Kraft misreads Lord Hale's treatise.  Indeed, in Morgan, we rejected a contention similar to Kraft's, that the provisions of the Magna Carta prevented the Crown from "grant[ing] the bottoms of navigable waters to private individuals thus interfering with the public right of fishing or oystering."  Id. at 521, 303 S.E.2d at 901 (emphasis added).  The

-3-

issue in Morgan was whether the king's patent gave the patentee an exclusive right to plant and harvest oysters in the stream bed under navigable waters. We quoted, with approval, the following from Lord Hale's treatise: "The king may grant fishing within a creek of the sea." Id. at 522, 303 S.E.2d at 902 (quoting from 1 F. Hargrave, Law Tracts at 17).

Although Kraft cites United States Supreme Court decisions which have held that the Crown had no unilateral power to grant title to land under navigable waters, that Court has recognized that this issue is a matter of state law. See United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 60 (1913); see also Loving v. Alexander, 745 F.2d 861, 868 (4th Cir. 1984). And we have held that the king did have the power to convey land under navigable waters to private persons. Morgan, 225 Va. at 523, 303 S.E.2d at 902.[3] Additionally, the General Assembly has codified this principle by its language excluding from state ownership all bay, river, and creek beds in the Commonwealth "conveyed by special grant or compact according to law." Id. at 523, 303 S.E.2d at 902 (quoting Code § 62.1-1)(emphasis in Morgan).

_____

[3]Kraft says we held in Bradford v. Nature Conservancy, 224 Va. 181, 197, 294 S.E.2d 866, 874 (1982), "that the title to subaqueous beds of navigable waters is always held 'subject to the public's rights to fish, fowl and hunt.'" However, as the property owners point out, this quote from Bradford was with regard to such beds that had not been granted by the Crown prior to the Revolution. Instead, as the property owners note, the grant was by an early agency of the Virginia government after such grants had been prohibited by statute. Indeed, as we indicated in Bradford, the Crown could grant such land "to a private individual." Id. at 194, 294 S.E.2d at 872. Accordingly, we think Bradford does not support Kraft's argument.

Indeed, in Boerner v. McCallister, 197 Va. 169, 174, 89 S.E.2d 23, 26-27 (1955), we indicated that George II did have the power to issue the 1750 Jackson patent that is involved in this suit. Since the Boerner plaintiff had not proved that the Jackson River was a navigable river, we decided the case on the premise that it was nonnavigable; thus, we declined to decide the plaintiff's contention that the public's right of navigation also included the right to fish. However, we noted that

> there is persuasive authority to the effect that even though a stream may be floatable, and in some instances navigable, the public interest therein is limited to the right of navigation; the only restraint placed upon the owner being that he cannot obstruct or impede the public right.

Id. at 174, 89 S.E.2d at 27; see also Charles C. Marvel, Annotation, Public Rights of Recreational Boating, Fishing, Wading, or the Like in Inland Stream the Bed of Which is Privately Owned, 6 A.L.R.4th 1030, 1038-41 (1981). Hence, we hold that the Crown had the right to grant the bottoms of the river and, therefore, exclusive fishing rights to Jackson and Morris.[4]

Apparently conceding that such rights were granted to Jackson, Kraft next argues that those rights were not included in the Morris patent. The Morris patent provides:

> George the third etc. To all etc. Know ye that,

---

[4]Since Kraft has not contended, either in the trial court or on appeal, that the fishing rights granted could not have been and were not exclusive, we do not consider that issue, which only the dissent has raised. See Rule 5:25; Avocet Development Corp. v. McLean Bank, 234 Va. 658, 671, 364 S.E.2d 757, 765 (1988).

for divers good causes and considerations but more specially for and in consideration of the sum of Ten Shillings of good and lawful money for our use paid to our Receiver General of our Revenues in this our Colony and Dominion of Virginia. We have given granted and confirmed and by these presents for us our heirs and successors Do give grant and confirm unto Richard Morris one certain Tract or parcel of land containing ninety three acres – lying and being in the County of Augusta on Jackson's River below Armstrong's land and bounded as followeth, to wit [metes and bounds description.]

With all etc. to have hold etc. to be held etc. yielding and paying etc. provided etc. [signatory language].

(Emphasis added).

According to Kraft, this patent did not grant fishing rights; the property owners claim that it did. To decide this issue, we must determine what is referred to in one of the various uses of "etc." interspersed in the Morris patent. In doing so, we consider the usual practice that was employed in issuing and recording royal patents such as this one.

Letters of patent issued to numerous persons by the royal governors acting as the Crown's agent were required to be in a statutory form, which included "the privileges of hunting, hawking, fishing and fowling." 3 Hening's Statutes at Large 308-09. Although royal governors made minor changes in the form, see e.g., Fairfax Harrison, Virginia Land Grants 17-18, 20-21, 25-26, 27-28, 29-30, 30-31, 33, 39-40, 44-45, 50-51 (1925), these privileges were usually included in these forms. Id.

All language was stated in full in the patent signed by the Crown's agent. After the patent was issued and before it was

delivered to the patentee, a colonial statute required that it be recorded in a central office. 5 Hening's Statutes at Large 417. These recorded patents were kept in so-called patent books, 4 Cavaliers and Pioneers: Abstracts of Virginia Land Patents and Grants at xv-xvii, xxvii-xxviii (1994). Generally, the recorded patent was abbreviated by omitting much of the form language in the original patent and incorporating that language in the recorded patent by the use of "etc." at the various places of omission and referencing a previously recorded patent containing that form language. Id. The recorded patents are "the fountain of land titles." Harrison, supra, at 7.

The recorded, and apparently abbreviated, Morris patent was in the 18th century treasury right form approved by a royal governor. See Harrison, supra, at 50. Harrison states that the formal (and omitted) clauses in that treasury right form were identical to those in the head right patent form of Governor Alexander Spotswood (quoted in full in Harrison, supra, at 39-40). Id. at 50.

> Spotwood's form includes the following language:
> With all woods, underwoods, Swamps, Marshes, Lowgrounds, Meadows, Feedings, and his due share of all Veins, Mines and Quarries as well discovered as not discovered within the bounds aforesaid, same being part of the said quantity of 47 acres of land [granted in this particular patent] and also the Rivers, Waters and Water Courses therein contained, together with the Privileges of Hunting, Hawking, Fishing, Fowling, and all other Profits, commodities and Hereditaments whatsoever to the same or any part thereof belonging or in any wise appertaining.

Id. at 40 (emphasis added).

-7-

In recording the Morris patent, the clerk omitted much of the form language contained in the Spotswood head right patent as well as in the Jackson patent (which contained essentially the same language regarding the privilege of fishing). Instead, the clerk apparently substituted "etc." for the omitted language.

We conclude that the recording clerk's use of "etc." was an incorporation by reference of the form language used in these other documents, particularly that emphasized in the quotation above. Hence, we think that this language incorporated the exclusive fishing rights of those documents in the Morris patent. Accordingly, we hold that Morris acquired such rights in the Jackson River, which rights at least some of the Morris claimants later acquired.[5]

Finally, Kraft contends that since the Witts and the Lovings did not trace their respective titles to the Crown patents, they

---

[5]As a matter of interest, we call attention to the recording clerk's marginal notation on the Morris patent: "Form page 1." Unfortunately, counsel did not introduce evidence indicating the form referred to or its contents. He merely introduced a copy of the recorded Morris patent, certified and admissible under the provisions of Code § 42.1-86, without indicating the patent book in which it was recorded.

The recorded patents are lodged in various patent books. As archival records, they are kept under the custody and control of the State Library Board. Code § 42.1-79. The recorded Morris patent is in Patent Book 38 at page 789. The patent recorded on page one of that book contains substantially the same language as that of the Spotswood head right patent, including the language regarding fishing rights. Because counsel failed to introduce the evidence linking the Morris patent to "Form page 1," we have not considered that information in deciding this case.

had not proved the necessary title to establish their case. Kraft further argues that in granting relief to those parties, the trial court erroneously applied the prima facie presumption of title of the party in possession of property under colorable title as set forth in Brunswick Land Corp. v. Perkinson, 146 Va. 695, 707-08, 132 S.E. 853, 856-57 (1926). According to Kraft, "if the plaintiff's claim of title is contested, then the plaintiff must show more than a mere possessory interest in the real property in question; the plaintiff must establish title."

The case that Kraft cites in support of this proposition, Lester Group, Inc. v. Little, 238 Va. 54, 56-57, 381 S.E.2d 3, 4-6 (1989), illustrates its inapplicability in this case. In Little, the defendant asserted an adverse claim of title in itself. Here, Kraft does not claim title in himself; instead, he claims fishing rights in the river over the streambed as a member of the public on the theory that these rights were never granted by the Crown.

Kraft admits that the Lovings and the Witts were in possession of the premises and he has not contested the chancellor's finding that they hold such possession under "a current deed conveying ownership of a portion of the Jackson River streambed." Hence, he recognizes their prior possession under color of title.

Therefore, the property owners were not required to trace title back to the patentees from the Crown. Such tracing is

unnecessary when an allegedly trespassing defendant, such as Kraft, does not claim title to the property and merely relies upon the alleged weaknesses in the title of the plaintiff who was in prior possession of the property under color of title. Perkinson, 146 Va. at 709-10, 132 S.E. at 857.

The issue does not turn on the interim conveyances after the Crown patents, but solely on the patents themselves. If, as we have held, the fishing rights were validly conveyed in those patents, Kraft trespassed on the lands of the parties in possession which are the lands described in the patents.[6]

Accordingly, Kraft was required to rebut the prima facie evidence of title of the Lovings and Witts supported by their possession under a color of title by showing a better and stronger title in himself or some other person under whom he claims. See id. at 708, 132 S.E. at 857. Since he has failed to do so, we find no significance in his contention that the Witts and Lovings failed to trace their titles to the Crown patents.

Accordingly, we will affirm the judgment of the trial court.

Affirmed.

CHIEF JUSTICE CARRICO, concurring in part and dissenting in part.

I agree with the majority with respect to its holding

---

[6]We also reject Kraft's claim that Morgan establishes the responsibility of the Witts and Lovings in this action to trace title to the king's patents. Although we noted in Morgan that credible evidence indicated the landowners had traced their titles back to the Crown, we did not indicate that this was a necessary, rather than a sufficient, element to establish the fact of a trespass. See 225 Va. at 521, 303 S.E.2d at 901.

-10-

concerning the Jackson patent.  I cannot, however, take the leap of faith the majority takes concerning the Morris patent in according the abbreviation "etc." the effect of incorporating by reference what the majority describes as "the form language used in . . . other documents" to delineate the privileges "usually" conveyed by a patent.

The issue is what was conveyed by the Morris patent.  The majority says that "[i]n recording the Morris patent, the clerk omitted much of the form language [used in other documents and] apparently substituted 'etc.' for the omitted language." (Emphasis added.)   But the clerk may just as well have substituted "etc." for some other and entirely different language, leaving to guesswork whether the language omitted from the Morris patent conveyed fishing rights.  Accordingly, I would hold that fishing rights were not validly conveyed by the Morris patent.

JUSTICE KOONTZ, with whom JUSTICE COMPTON joins, dissenting.

I respectfully dissent.

The pertinent facts are not in dispute.  On April 14, 1992 and other unspecified occasions, Charles A. Kraft, Jr. fished from a boat floating in the navigable waters of that part of the Jackson River in Alleghany County adjacent to land owned by the appellees.  Kraft did not walk on the banks of, wade upon the bed of, or anchor his boat in that part of the river.  Appellees claim to own the stream beds under the Jackson River adjacent to

their property and the exclusive fishing rights in that part of it above those beds pursuant to grants from the English Crown in 1750 (the Jackson patent) and in 1769 (the Morris patent).

The majority concludes that the landowners have established that they are the successors in title to the patentees of the Jackson and Morris patents and that those patents granted exclusive fishing rights by the language "together with the Privileges of Hunting, Hawking, Fishing [and] Fowling" sufficient to enjoin Kraft, as a trespasser, from fishing in this part of the Jackson River. In my view, the result of the majority's conclusions is neither supported by the established facts nor mandated by the law.

For purposes of explaining my view, I will assume, without addressing the issue, that the majority has correctly concluded that the landowners have established that they acquired ownership of the stream beds and appurtenant fishing rights conveyed with them through the grants of the English Crown. I concur that prior decisions of this Court, and the view of most commentators, affirm the power of the Crown to make such grants generally. See Boerner v. McCallister, 197 Va. 169, 174, 89 S.E.2d 23, 26–27 (1955). I disagree with the majority that these specific grants provide the landowners with the exclusive right to fish the navigable waters above their lands. The exclusivity of these fishing rights is an inherent part of the issue presented by this appeal.

-12-

As revealed by the facts, here we are not concerned with an entry upon the banks or the stream bed of the river by Kraft for the purpose of fishing in the water of the river. Kraft was lawfully in the water at that part of the river in question. Moreover, the fish he intended to catch were in a state of fera naturæ, free to swim up and down the river and free of any claim of private ownership. Fish in navigable waters are distinctly different from oysters, and other shell fish, restricted by their very nature to particular water beds and, thus, subject to private ownership. See generally Commonwealth v. Morgan, 225 Va. 517, 303 S.E.2d 899 (1983) (concerning ownership to oyster beds). Under these facts, it is clear that Kraft did not enter upon the property of the landowners even if the landowners established their ownership of the stream beds.

I turn then to the fishing rights asserted by the landowners. There is considerable debate about the historical rights and responsibilities of the English Crown with respect to navigable waters. In De Jure Maris, Lord Hale defined those rights and responsibilities by three concepts: (1) the jus publicum, or the rights of the general public; (2) the jus regium, or the right of the sovereign to manage resources for the benefit of the public; and (3) the jus privatum, or the private right of title. See Shively v. Bowlby, 152 U.S. 1, 11-13 (1894). Rights of commerce, specifically navigation and fishing, are jus publicum, and, accordingly, ought not to be extinguished by the

-13-

transfer of a _jus privatum_.  _See id._

The concepts of _jus publicum_ and _jus regium_ have been construed, some commentators suggest erroneously so, in support of the theory of common law public trust to give the public a proprietary interest in, among other things, fishing rights on navigable waters.  _See_ Richard Ausness, _Water Rights, the Public Trust Doctrine, and the Protection of Instream Uses_, 1986 U. Ill. L. Rev. 407, 411-12 (1986).  I do not believe, however, that this appeal raises the issue of a public trust or need be resolved by application of that doctrine.

Rather, the issue here centers on a dispute between private parties, and whether one party has established its right to an injunction prohibiting the other party from entering its land via a navigable waterway for the purpose of fishing in that waterway.  Accordingly, the burden rests with the party seeking the injunction to show that it is so entitled.  In my view, the landowners have not met that burden.

The majority concludes, as a matter of state law, "that the Crown had the right to grant the bottoms of the river and, therefore, exclusive fishing rights to Jackson and Morris."  That conclusion, however, does not support the proposition that the Crown necessarily intended to grant _exclusive_ fishing rights or that it in fact did so in the patents in question.  The majority cites no authority in support of its conclusion that the fishing rights were necessarily exclusive or that the Crown could not

-14-

grant less than exclusive fishing rights.  In any event, the language of the patents does not specifically grant exclusive fishing rights.

With respect to the landowners who trace their rights back to the Jackson patent, they have shown nothing more than a grant of "Privileges of . . . Fishing" on the lands granted under the patents.  (Emphasis added.)  The landowners claiming under the Morris grant can show no more than this, and must do so by relying on a liberal interpretation of the term "etc." in that grant by relating it back to a previous grant containing language nearly identical to that of the Jackson patent.

Courts have traditionally construed royal patents and other land grants narrowly and with great caution where the potential loss of a jus publicum is at issue.  See e.g., Martin v. Waddell, 41 U. S. (16 Pet.) 367, 408-11 (1842).  I am of the opinion that the use of the term privileges in the patents, when narrowly construed, confers no more than the right of the landowners to exclude others from entering the land conveyed for the purpose of fishing.  That is, the Crown was not retaining for itself a jus privatum to enter the land, or to permit others to do so, for fishing.

By contrast, the patents specifically do not, because under the better view they could not, convey the common of piscary--an exclusive right to take fish in a state of fera naturæ--because that right was, as noted above, a jus publicum not subject to

-15-

transfer from the Crown to a private citizen.  In short, while the Crown could transfer its private right of title to entry on the land for the purpose of fishing, it could not transfer the public right to take fish from the waters thereon by persons otherwise lawfully in those waters.

Here, Kraft lawfully navigated the river overrunning the stream bed owned by the landowners.  So long as he remained in navigable waters and did not touch the banks or drag the stream bed with nets, seines or an anchor, he was not trespassing on the landowners' property.  Since, in my view, the landowners established no more than a right to prohibit fishing by excluding others from entry upon their land for that purpose, I would hold that the trial court erred in awarding an injunction against Kraft which prohibited him from fishing while lawfully in the navigable waters of the river.