SENIOR JUSTICE WHITING
delivered the opinion of the Court.
*275 In this appeal, the primary issues are whether letters of patent from two English monarchs, acting through their royal governors, could and did grant exclusive fishing rights in a navigable river, and, if so, whether the complainants are the successors in title to the patentees and can assert those rights to prohibit the public from fishing in the part of the river running over their land.
Ethridge E. Burr and a number of other persons (the property owners) claim to own the stream beds under parts of the Jackson River in Alleghany County adjacent to their property. They also claim exclusive fishing rights in that portion of the river above those beds. These claims originate in two 18th century Crown patents to the property owners’ predecessors in title. Each patent conveyed property on both sides of the river, and included the stream beds in the metes and bounds descriptions.
Fishing rights were expressly conveyed in a 1750 patent from George II to William Jackson, a predecessor in title to Ethridge E. and Hazel Burr and an alleged predecessor in title to Bobbie E. and Nancy A. Witt and Robert M. and Bettie H. Loving as to part of the Lovings’s property (collectively, the Jackson claimants). There is a dispute whether fishing rights were conveyed in a 1769 patent of the land immediately northeast of the Jackson patent from George HI to Richard Morris, an alleged predecessor in title of the Lovings’s remaining property, and a predecessor in title of the remaining property owners (collectively, the Morris claimants).[1]
The property owners brought this suit against Charles A. Kraft, Jr., to enjoin him from fishing or wading “in the waters of Jackson River running over plaintiffs’ land.” They also sought a judicial declaration of their ownership of the subaqueous land described in their deeds and of their exclusive fishing rights in the river running over that land.[2]
The evidence at an ore terms hearing indicated that Kraft, a professional fishing guide, had fished in the Jackson River adjacent to land upon which the property owners had posted signs prohibiting fishing. All the property owners but the Witts and Lovings traced title to either the Jackson or Morris patents. The Witts and Lovings, who were in possession of stream beds adjacent to their land, claimed title thereto simply by virtue of earlier deeds from previous *276 owners. Concluding that the property owners owned the submerged land and exclusive fishing rights therein, the chancellor enjoined Kraft from wading and fishing in the river over that land.
We awarded Kraft an appeal. He renews the contentions he made before the chancellor.
First, Kraft contends that any title the Crown allegedly granted in the stream beds could not have included exclusive fishing rights in the part of the river flowing over those beds. According to Kraft, under early English common law the king held the fishing rights of navigable streams jus publicum, i.e., in trust for the public, and thus he could not convey those rights to private persons. Kraft bases his argument upon conclusions he draws from a treatise of Lord Chief Justice Hale entitled De Jure Maris et Brachiorum Ejusdem (Concerning the Law of the Sea and its Arms), published in Hargrave’s Law Tracts (Dublin 1787). This treatise “has been recognized by this Court as the ‘best and most authoritative [tjreatise’ on the power of the sovereign over streams, and ‘indeed [the work] from which all who have written since seem to have drawn.’ ” Commonwealth v. Morgan, 225 Va. 517, 523, 303 S.E.2d 899, 902 (1983) (quoting Crenshaw v. Slate River Co., 27 Va. (6 Rand.) 245, 260 (1828)).
We think that Kraft misreads Lord Hale’s treatise. Indeed, in Morgan, we rejected a contention similar to Kraft’s, that the provisions of the Magna Carta prevented the Crown from “granting] the bottoms of navigable waters to private individuals thus interfering with the public right of fishing or oystering.” Id. at 521, 303 S.E.2d at 901 (emphasis added). The issue in Morgan was whether the king’s patent gave the patentee an exclusive right to plant and harvest oysters in the stream bed under navigable waters. We quoted, with approval, the following from Lord Hale’s treatise: “The king may grant fishing within a creek of the sea.” Id. at 522, 303 S.E.2d at 902 (quoting from 1 F. Hargrave, Law Tracts at 17).
Although Kraft cites United States Supreme Court decisions which have held that the Crown had no unilateral power to grant title to land under navigable waters, that Court has recognized that this issue is a matter of state law. See United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 60 (1913); see also Loving v. Alexander, 745 F.2d 861, 868 (4th Cir. 1984). And we have held that the king did have the power to convey land under navigable waters to *277 private persons. Morgan, 225 Va. at 523, 303 S.E.2d at 902.[3] Additionally, the General Assembly has codified this principle by its language excluding from state ownership all bay, river, and creek beds in tiie Commonwealth “conveyed by special grant or compact according to law.” Id. at 523, 303 S.E.2d at 902 (quoting Code § 62.1-1) (emphasis in Morgan).
Indeed, in Boerner v. McCallister, 197 Va. 169, 174, 89 S.E.2d 23, 26-27 (1955), we indicated that George II did have the power to issue the 1750 Jackson patent that is involved in this suit. Since the Boerner plaintiff had not proved that the Jackson River was a navigable river, we decided the case on the premise that it was nonnavigable; thus, we declined to decide the plaintiff’s contention that the public’s right of navigation also included the right to fish. However, we noted that
there is persuasive authority to the effect that even though a stream may be floatable, and in some instances navigable, the public interest therein is limited to the right of navigation; the only restraint placed upon the owner being that he cannot obstruct or impede the public right.
Id. at 174, 89 S.E.2d at 27; see also Charles C. Marvel, Annotation, Public Rights of Recreational Boating, Fishing, Wading, or the Like in Inland Stream the Bed of Which is Privately Owned, 6 A.L.R.4th 1030, 1038-41 (1981). Hence, we hold that the Crown had the right to grant the bottoms of the river and, therefore, exclusive fishing rights to Jackson and Morris.[4]
Apparently conceding that such rights were granted to Jackson, Kraft next argues that those rights were not included in the Morris patent. The Morris patent provides:
*278 George the third etc. To all etc. Know ye that, for divers good causes and considerations but more specially for and in consideration of the sum of Ten Shillings of good and lawful money for our use paid to our Receiver General of our Revenues in this our Colony and Dominion of Virginia. We have given granted and confirmed and by these presents for us our heirs and successors Do give grant and confirm unto Richard Morris one certain Tract or parcel of land containing ninety three acres - lying and being in the County of Augusta on Jackson’s River below Armstrong’s land and bounded as followeth, to wit [metes and bounds description.]
With all etc. to have hold etc. to be held etc. yielding and paying etc. provided etc. [signatory language].
(Emphasis added).
According to Kraft, this patent did not grant fishing rights; the property owners claim that it did. To decide this issue, we must determine what is referred to in one of the various uses of “etc.” interspersed in the Morris patent. In doing so, we consider the usual practice that was employed in issuing and recording royal patents such as this one.
Letters of patent issued to numerous persons by the royal governors acting as the Crown’s agent were required to be in a statutory form, which included “the privileges of hunting, hawking, fishing and fowling.” 3 Hening’s Statutes at Large 308-09. Although royal governors made minor changes in the form, see e.g., Fairfax Harrison, Virginia Land Grants 17-18, 20-21, 25-26, 27-28, 29-30, 30-31, 33, 39-40, 44-45, 50-51 (1925), these privileges were usually included in these forms. Id.
All language was stated in full in the patent signed by the Crown’s agent. After the patent was issued and before it was delivered to the patentee, a colonial statute required that it be recorded in a central office. 5 Hening’s Statutes at Large 417. These recorded patents were kept in so-called patent books, 4 Cavaliers and Pioneers: Abstracts of Virginia Land Patents and Grants at xv-xvii, xxvii-xxviii (1994). Generally, the recorded patent was abbreviated by omitting much of the form language in the original patent and incorporating that language in the recorded patent by the use of “etc.” at the various places of omission and referencing a previously *279 recorded patent containing that form language. Id. The recorded patents are “the fountain of land titles.” Harrison, supra, at 7.
The recorded, and apparently abbreviated, Morris patent was in the 18th century treasury right form approved by a royal governor. See Harrison, supra, at 50. Harrison states that the formal (and omitted) clauses in that treasury right form were identical to those in the head right patent form of Governor Alexander Spotswood (quoted in full in Harrison, supra, at 39-40). Id. at 50.
Spotwood’s form includes the following language:
With all woods, underwoods, Swamps, Marshes, Lowgrounds, Meadows, Feedings, and his due share of all Veins, Mines and Quarries as well discovered as not discovered within the bounds aforesaid, same being part of the said quantity of 47 acres of land [granted in this particular patent] and also the Rivers, Waters and Water Courses therein contained, together with the Privileges of Hunting, Hawking, Fishing, Fowling, and all other Profits, commodities and Hereditaments whatsoever to the same or any part thereof belonging or in any wise appertaining.
Id. at 40 (emphasis added).
In recording the Morris patent, the clerk omitted much of the form language contained in the Spotswood head right patent as well as in the Jackson patent (which contained essentially the same language regarding the privilege of fishing). Instead, the clerk apparently substituted “etc.” for the omitted language.
We conclude that the recording clerk’s use of “etc.” was an incorporation by reference of the form language used in these other documents, particularly that emphasized in the quotation above. Hence, we think that this language incorporated the exclusive fishing rights of those documents in the Morris patent. Accordingly, we hold that Morris acquired such rights in the Jackson River, which rights at least some of the Morris claimants later acquired.[5]
*280 Finally, Kraft contends that since the Witts and the Lovings did not trace their respective titles to the Crown patents, they had not proved the necessary title to establish their case. Kraft further argues that in granting relief to those parties, the trial court erroneously applied the prima facie presumption of title of the party in possession of property under colorable title as set forth in Brunswick Land Corp. v. Perkinson, 146 Va. 695, 707-08, 132 S.E. 853, 856-57 (1926). According to Kraft, “if the plaintiff’s claim of title is contested, then the plaintiff must show more than a mere possessory interest in the real property in question; the plaintiff must establish tide.”
Hie case that Kraft cites in support of this proposition, Lester Group, Inc. v. Little, 238 Va. 54, 56-57, 381 S.E.2d 3, 4-6 (1989), illustrates its inapplicability in this case. In Little, the defendant asserted an adverse claim of title in itself. Here, Kraft does not claim title in himself; instead, he claims fishing rights in the river over the streambed as a member of the public on the theory that these rights were never granted by the Crown.
Kraft admits that the Lovings and the Witts were in possession of the premises and he has not contested the chancellor’s finding that they hold such possession under “a current deed conveying ownership of a portion of the Jackson River streambed.” Hence, he recognizes their prior possession under color of title.
Therefore, the property owners were not required to trace title back to the patentees from the Crown. Such tracing is unnecessary when an allegedly trespassing defendant, such as Kraft, does not claim title to the property and merely relies upon the alleged weaknesses in the title of the plaintiff who was in prior possession of the property under color of title. Perkinson, 146 Va. at 709-10, 132 S.E. at 857.
The issue does not turn on the interim conveyances after the Crown patents, but solely on the patents themselves. If, as we have held, the fishing rights were validly conveyed in those patents, Kraft trespassed on the lands of the parties in possession which are the lands described in the patents.[6]
*281 Accordingly, Kraft was required to rebut the prima facie evidence of title of the Lovings and Witts supported by their possession under a color of title by showing a better and stronger title in himself or some other person under whom he claims. See id. at 708, 132 S.E. at 857. Since he has failed to do so, we find no significance in his contention that the Witts and Lovings failed to trace their titles to the Crown patents.
Accordingly, we will affirm the judgment of the trial court.

Affirmed.

 The remaining property owners are Thomas G. Botkins, Jr., Sarah Botkins Crosier, Alan S. Botkins, and Robert W. Botkins, with their respective spouses, Phyllis N. Botkins, Bobby P. Crosier, Joyce B. Botkins, and Elizabeth G. Botkins having marital interests.

 Four of the original 18 complainants nonsuited their cases.

 Kraft says we held in Bradford v. Nature Conservancy, 224 Va. 181, 197, 294 S.E.2d 866, 874 (1982), “that the title to subaqueous beds of navigable waters is always held ‘subject to the public’s rights to fish, fowl and hunt’ ” However, as the property owners point out, this quote from Bradford was with regard to such beds that had not been granted by the Crown prior to the Revolution. Instead, as the property owners note, the grant was by an early agency of the Virginia government after such grants had been prohibited by statute. Indeed, as we indicated in Bradford, the Crown could grant such land “to a private individual.” Id. at 194, 294 S.E.2d at 872. Accordingly, we think Bradford does not support Kraft’s argument.

 Since Kraft has not contended, either in the trial court or on appeal, that the fishing rights granted could not have been and were not exclusive, we do not consider that issue, which only the dissent has raised. See Rule 5:25; Avocet Development Corp. v. McLean Bank, 234 Va. 658, 671, 364 S.E.2d 757, 765 (1988).

 As a matter of interest, we call attention to the recording clerk’s marginal notation on the Morris patent “Form page 1.” Unfortunately, counsel did not introduce evidence indicating the form referred to or its contents. He merely introduced a copy of the recorded Morris patent, certified and admissible under the provisions of Code § 42.1-86, without indicating the patent book in which it was recorded.
The recorded patents are lodged in various patent books. As archival records, they are kept under the custody and control of the State Library Board. Code § 42.1-79. The recorded Morris patent is in Patent Book 38 at page 789. The patent recorded on page one of that book contains substantially the same language as that of the Spotswood head right patent, including the lan *280 guage regarding fishing rights. Because counsel failed to introduce the evidence linking the Morris patent to “Form page 1,” we have not considered that information in deciding this case.

 We also reject Kraft’s claim that Morgan establishes the responsibility of the Witts and Lovings in this action to trace title to the king’s patents. Although we noted in Morgan that credible evidence indicated the landowners had traced their titles back to the Crown, we did not indicate that this was a necessary, rather than a sufficient, element to establish the fact of a trespass. See 225 Va. at 521, 303 S.E.2d at 901.